UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SUSAN SANDERS,

                                        Plaintiff,                <u>COMPLAINT</u>

           - against -

                                                  PLAINTIFF DEMANDS A
SUNY DOWNSTATE MEDICAL CENTER and    <u>TRIAL BY JURY</u>
SUSAN FRASER-MCCLEARY,

                                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff Susan Sanders ("Sanders" or "Plaintiff"), by her attorneys, Vladeck,

Raskin & Clark, P.C., complaining of defendants SUNY Downstate Medical Center ("Downstate")

and Susan Fraser-McCleary ("Fraser-McCleary") (collectively, "defendants") alleges:

<u>NATURE OF CLAIMS</u>

        1.      Sanders, a social worker with over three decades of experience, has

dedicated her professional career to helping others.  For the first 11 years of her tenure at SUNY

Downstate, she was an outpatient social worker in the Transplant Program based at University

Hospital of Brooklyn, assessing patients' suitability for kidney transplants and counseling patients

and their families on all phases of the transplant process.  She has consistently received excellent

performance reviews and helped elevate the stature of the Transplant Program by establishing

relationships with kidney donor organizations, presenting at professional conferences, and leading

efforts to promote public awareness and increase kidney donors.

        2.      Despite her long tenure at Downstate and commitment to helping those who

need kidney transplants, when Sanders sought to take care of her sick son, defendants, including

the Vice President of Care Management Fraser-McCleary, punished plaintiff.    In the summer 2020, at the outset of the global pandemic, Sanders's son had emergency, life-saving surgery after his condition had deteriorated.  Even though her son's serious medical condition required that she avoid exposure to COVID, after she returned from protected leave pursuant to the Family Medical Leave Act, defendants, apparently fed up with time Sanders had missed from work and assumptions about her lack of attentiveness in the future, forced Sanders into a new inpatient social work role that significantly increased her risks of contracting the disease and placed her son in danger.   When Sanders protested the transfer and made protected complaints, Fraser-McCleary made clear that she was determined to transfer plaintiff even though the new role placed Sanders in a worse position and did not improve patient care.

3.    Around this same time, Sanders began suffering severe anxiety, experiencing panic attacks, and was diagnosed with Post-Traumatic Stress Disorder.   Not only did defendants deny Sanders's reasonable accommodation requests that her doctors recommended so she could successfully perform her job, but they relied on falsehoods to support their decision. Incredibly, defendants asserted that they had already accommodated her by moving her to the inpatient social work role – the very same role that she repeatedly objected to and that endangered the wellbeing of Sanders and her son.

4.    Defendants' harassment, discrimination, and retaliation are ongoing and have created an environment that makes it nearly impossible for Sanders to perform her job.  For example, even though there have been available positions that Sanders is qualified for, that would address Sanders's accommodation requests, and that would render Sanders safer from infection, defendants have failed to move her to those roles.

5.      As to Downstate and Fraser-McCleary, plaintiff brings this action to remedy violations of the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. (the "FMLA").

6.      As to Downstate, plaintiff also brings this action to remedy discrimination on the basis of her disability and association with a person with a disability; failure to grant her reasonable accommodation requests; and to remedy retaliation because of her protected activities, including, inter alia, for requesting reasonable accommodations and for opposing unlawful conduct, in violation of the Rehabilitation Act of 1973, 29 U. S.C. § 701 et seq. (the "Rehabilitation Act").

7.      As to Fraser-McCleary, plaintiff also brings this action to remedy discrimination on the basis of her disability and association with a person with a disability; failure to grant her reasonable accommodation requests; and to remedy retaliation because of her protected activities, including, inter alia, for requesting reasonable accommodations and for opposing unlawful conduct, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"); the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. (the "Executive Law"); and the Administrative Code of the City of New York § 8-107 et seq. (the "City Law").

8.      Plaintiff seeks compensatory and punitive damages, injunctive and declaratory relief, and appropriate legal and equitable relief.

JURISDICTION AND VENUE

9.      This Court has jurisdiction over plaintiff's claims under the ADA, the Rehabilitation Act, and the FMLA under 28 U.S.C. §§ 1331 and 1343(a) and 29 U.S.C. § 2617(a)(2).

10.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over plaintiff's Executive Law and City Law claims because these claims closely relate to the Rehabilitation Act, ADA, and FMLA claims, having arisen from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

11.     On September 13, 2021, Sanders filed a charge of discrimination against Downstate with the United States Equal Opportunity Employment Commission (the "EEOC").  On or about July 14, 2022, plaintiff received from the EEOC a notice informing her of her right to sue under the ADA.  Plaintiff has thus complied fully with all prerequisites required by the ADA.

12.     Pursuant to Section 8-502(c) of the New York City Human Rights Law, plaintiff will cause to be served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the defendant Downstate is headquartered in Brooklyn, New York and of the acts of discrimination and retaliation occurred in New York.

<u>PARTIES</u>

14.     Sanders resides in New York. Throughout her employment with Downstate, Sanders worked in Brooklyn, New York.

15.     Plaintiff is an individual with a disability within the meaning of the Rehabilitation Act, the ADA, the Executive Law, and the City Law.

16.     Defendant SUNY Downstate Medical Center is a not-for-profit public higher education institution located in Brooklyn, New York.

17.     Downstate encompasses a medical school, two colleges, two graduate schools, several research and biotechnology centers, and a teaching hospital with outpatient clinics and community health centers throughout Brooklyn.

18.     On information and belief, Downstate receives federal financial assistance.

19.     Defendant Susan Fraser-McCleary is the Assistant Vice President for Care Coordination at Downstate in Brooklyn. In this role, which she began in the summer 2019, she oversees the Social Work department. Fraser-McCleary resides in New York.

<u>FACTUAL ALLEGATIONS</u>

<u>Plaintiff's Background and Employment with Downstate</u>

20.     Sanders received a Master of Social Work degree from the University of California, Berkeley in 1982.  She also received a certificate in Supervision of Master's Level Social Work Students from New York University.

21.      From 1987 to 1999, Sanders worked as a Clinical Social Worker in the Child and Adolescent Outpatient Service department of Maimonides Medical Center.

22.     Sanders has maintained a private psychotherapy practice, with offices in Brooklyn and Manhattan, serving children, adolescents, and adults since 1990.

23.     On or about June 25, 2009, Sanders joined Downstate's hospital called University Hospital of Brooklyn (the "Hospital") as a social worker in Downstate's Transplant Program.

24.     From the time of her hiring until September 2020, Sanders primarily was responsible for working with transplant patients in an outpatient unit.

25.     In her role as an outpatient transplant social worker, Sanders assessed patients' psychosocial functioning and suitability for kidney transplant and provided information

and education regarding the risks and benefits of transplant. She also helped counsel patients and their families at all phases of the transplant process, including through a post-transplant support group which she started in 2010.

26.     From 2013 to 2020, Sanders was the only outpatient social worker assigned to work with transplant patients at the Hospital.

27.      From approximately 2013 to 2022, Sanders reported to Social Work Supervisor Heather Frier ("Frier").

28.     Beginning in the summer of 2019, Frier reported to Assistant Vice President of Care Coordination Fraser-McCleary.  Since the summer of 2019, Fraser-McCleary has overseen the Social Work department.

29.     Throughout her employment, Sanders consistently received positive performance evaluations and feedback from her managers and maintained good relationships with her peers and supervisors.

30.     In 2017, Sanders helped establish a relationship between Downstate and Renewal, an organization that works within the religious Jewish community to find altruistic living kidney donors. As a result of her efforts, one of Downstate's patients received an altruistic living donation, which was the first performed at Downstate in many years.

31.     In 2018, during Downstate's Sixth Annual Transplant Symposium, Sanders gave a presentation titled "Psychosocial Considerations in Transplant Evaluation" and participated in a panel discussion.  Transplant professionals from throughout the United States attended the event.

32.     Sanders also worked with the National Living Donor Assistance Center to secure funding for those individuals traveling to Downstate for living donor surgery. This work

was aimed at removing the financial burden of missed days of employment and travel expenses, which can be a barrier to living donation.

33.     Every October for New York Donor Enrollment Day and every March for World Kidney Day, Sanders led events to promote awareness and increase the number of individuals volunteering to become donors in New York.

34.     Throughout her tenure, Sanders has continued her training and education. For example, in 2018 she was one of two volunteers from Downstate's Transplant program to obtain additional training at LiveOnNY to better understand the organ donation process, particularly organ allocation.

35.     Sanders is a member of the Society for Transplant Social Workers. The Society for Transplant Social Workers is a professional membership organization dedicated to clinical excellence; research and education on psychosocial issues; and peer support among solid organ transplant social workers.

<u>SUNY's Transplant Program Is Suspended</u>

36.     In July 2019, the United Network for Organ Sharing ("UNOS") temporarily suspended the Hospital's Transplant program due to concerns about patient safety.

37.     The transplant program was reopened on July 6, 2020.

38.      During the shutdown period, Sanders helped transplant patients find alternative healthcare providers and assisted in other areas of the Hospital.

39.      In January and February 2020, the Hospital purportedly restructured the Social Work Department. As part of its restructuring effort, the Hospital transferred several social workers as part of a shift from a team-based model to a unit-based model.

40.     Downstate told employees that it made the changes in an effort to reduce the length of time that patients stayed at the Hospital.

41.     Because she worked almost exclusively in an outpatient setting, Sanders's job had no connection to the length of time patients stayed in the Hospital and she was not transferred at that time.

Sanders Takes Leave to Care for Her Son

42.     In 2016, Sanders's son was diagnosed with Ulcerative Colitis, an inflammatory bowel disease that causes inflammation and ulcers (or sores) in the digestive tract. He received treatment for his condition at New York University Langone Medical Center and the Cleveland Clinic between 2016 and 2018.

43.     Sanders is the primary caregiver for her son.

44.     At all times since 2016, Downstate has been aware that Sanders has a son with a disability that required her to care for him.

45.     Fraser-McCleary has been aware that Sanders has a son with a disability since 2019.

46.      Because his illness did not respond to multiple treatments, Sanders's son underwent a total colectomy, which required three surgeries between October 2018 and August 2019, including removal of his colon. Sanders took time off work to care for her son following those surgeries.

47.     In November 2019, doctors advised Sanders that due to complications, all three surgeries would need to be repeated.

48.     The first repeat procedure took place on or about January 16, 2020. Sanders was out of work to care for her son from January 15 to January 21, 2020.

49.     Sanders was informed of her right to take job-protected medical leave to care for her son under the FMLA in 2020.

50.     On or about March 13, 2020, Downstate approved Sanders retroactively for FMLA leave to apply to the time she had taken off in January 2020.

51.     Sanders's son was supposed to have a second repeat surgery in July 2020, but due to a rare and sudden complication that was diagnosed on July 9, 2020, the second repeat surgery did not take place at that time. Instead, he had emergency life-saving surgery on July 14, 2020.

51.     Sanders's son spent 18 days in the hospital, including three days in the Intensive Care Unit, in July 2020. He was subsequently readmitted on August 1, 2020 for nine additional days.

52.     Sanders took FMLA protected leave in July and August 2020 to care for her son.

53.     Sanders was out of the office on leave on July 9, 10, and 13. She returned to work on July 14, 2020 to attend a meeting, but she left when she received notification that her son was having emergency surgery.

54.      Sanders was then out on leave between July 15 and August 18, 2020, with the exception of one day in the office on July 24.

55.     Between August 18 and 28, 2020, Sanders worked a reduced schedule to care for her son.

56.     Following the July 14, 2020 surgery, Sanders's son required a feeding tube for TPN nutrition, a method of feeding that bypasses the gastrointestinal tract, because he was

unable to fully absorb food. In addition, after his discharge from the hospital, he required numerous medications that he received via intravenous tube.

57.     Sanders handled some of her son's nursing responsibilities after he was discharged from the hospital, including flushing her son's peripherally inserted central catheter ("picc") line, giving an injection into his picc line, and disconnecting and sanitizing his catheter.

58.     In September 2020, Sanders's son was hospitalized for a week with bacteremia, a life-threatening condition that required Sanders to be out of the office for several days to care for him.

59.     Sanders's son had the two additional repeat surgeries on or about January 20, 2021 and May 20, 2021. Sanders missed work to care for him in connection with those surgeries, including more than a week in January 2021 and in May 2021.  For both surgeries, Sanders used FMLA protected leave.

<u>Downstate Denies Sanders's Request to Work from Home</u>

60.     After the onset of the COVID-19 pandemic in March 2020, Sanders repeatedly requested to work from home to care for her son and avoid exposing him to the virus.

61.     On March 25, 2020, Sanders sent an email to Zachary Durkin ("Durkin"), Personnel Associate in the Office of Employee Labor Relations ("OELR"), requesting information as to whether she was entitled to work from home as an accommodation. Durkin referred her to the Downstate ADA group.

62.     On March 30, 2020, Sanders submitted a request to work from home, which included a letter from her son's doctor to the Downstate ADA office.

63.     Sanders explained to Nicole Sharpe ("Sharpe"), the ADA Ethics Analyst and Associate to Assistant Vice President, that she needed to work from home because of her son's serious medical condition.

64.     Later, Sharpe told Sanders that it "should be possible" to grant her request to work from home, but that she would need permission from Sanders's immediate supervisor.

65.     Anthony Parker ("Parker"), Assistant Vice President of Human Resources, also told Sanders that his office could not grant the request and that she should seek permission from her managers.

66.     When Sanders made the request to her direct supervisor, Frier, Frier told her that she did not have the authority to grant it.

67.     Accordingly, Sanders forwarded her request to work from home to Frier's supervisor, Fraser-McCleary, on April 1, 2020. Fraser-McCleary never responded to her request.

68.     Because she did not receive a response, Sanders emailed Parker again on April 6, 2020. He did not respond to her.

69.     On April 9, 2020, Sanders began experiencing symptoms of COVID and the Hospital's Office of Student and Employee Health sent her home.

70.     Sanders was diagnosed with COVID on April 13, 2020. As a result, she was on an approved medical leave of absence for three weeks to recover from COVID.

71.     During this time, Sanders's son had to live elsewhere to avoid exposure to the virus.

72.     After defendants failed to grant her request to work from home, Sanders continued to work at the Hospital.

73.     When the COVID pandemic began, the Hospital was designated as one of three COVID-only hospitals in New York state. As a result, most Hospital employees, including Sanders were assigned responsibilities dealing with COVID patients.

74.     Defendants required Sanders to provide social work services to patients assigned to Nursing Station ("NS") 33, the Medical Intensive Care Unit.

75.     Defendants directed many employees, including the Transplant team, to work from home. However, it required social workers, including Sanders, to report to work in person.

76.     Defendants required Sanders to work in person even though she was able to perform her job remotely.

77.     Sanders was not seeing patients or their family members in person. Instead, she was speaking to the families of patients assigned to NS 33 by telephone as most patients were intubated and not able to speak for themselves.

<u>Defendants Transfer Sanders to a New Job</u>

78.     Between May and June 2020, Sanders worked in person as directed.

79.     As set forth above, on or about July 9, 2020, Sanders's son was admitted to the hospital, she took FMLA-protected leave to care for him.

80.     When Sanders returned to work on or about July 14, 2020, she received an email from Fraser-McCleary with the subject line "Reassignment" that directed her to meet with Fraser-McCleary that afternoon.

81.     Sanders agreed to meet but was ultimately unable to attend because her son had to undergo emergency lifesaving surgery that day and she left work to be with him at the hospital.

82.     On July 28, 2020, while she was out of the office on FMLA leave, Frier sent Sanders an email stating that Sanders would need to meet about her "reassignment" to a medical inpatient unit when she returned to work.

83.     After she returned from her FMLA leave, Sanders met with Frier on or about August 18, 2020. Frier told Sanders that defendants were transferring her to a new position on an inpatient medical floor effective September 21, 2020.

84.     On or about August 25, 2020, Sanders received a letter from Fraser-McCleary confirming the transfer effective September 21, 2020.

85.      In the letter, Fraser-McCleary stated that Sanders would be transferred to the "Inpatient Unit," which would include all transplant patients admitted to the Hospital. The transplant floor in the Hospital was located on NS 82.

86.     Defendants did not provide an explanation for the decision to transfer Sanders.

87.     The transfer did not serve the interests of patient care, as Sanders has extensive experience in outpatient work and minimal experience as an inpatient social worker.

88.     Defendants transferred to Sanders's position another social worker, who had extensive inpatient experience and who Downstate specifically hired to work on NS 82. The other social worker did not want or request this transfer.

89.      This was the only social worker transfer that took place during the summer and fall of 2020.

90.     Sanders had successfully performed her job as an outpatient social worker for over a decade.

91.     The responsibilities of an inpatient social worker are much different than those Sanders had performed as an outpatient social worker.

92.     As an outpatient social worker, Sanders was primarily responsible for providing social work services to kidney donors and recipients visiting the Transplant clinic.

93.     In contrast, for the inpatient role, Sanders has worked exclusively with individuals admitted to the Hospital. The goals for inpatient care are to arrange a safe discharge of an admitted patient in the most expeditious way possible.

94.     The transfer to an inpatient role created even greater risk to Sanders's son's health based on her exposure to COVID and other contagious diseases.

95.      Even though Hospital policy stated that COVID-positive patients were not admitted to NS 82, several patients were admitted with suspected diagnoses of COVID after testing negative.

96.      Patients with other contagious viruses and diseases, including Clostridium difficile (C. Diff), Methicillin-Resistant Staphylococcus Aureus (MRSA), Respiratory Syncytial Virus (RSV), and suspected Tuberculosis were also admitted to NS 82.

97.     Also, contrary to statements that Fraser-McCleary had made, Sanders's assignment was not limited to NS 82.

98.     Defendants assigned Sanders to numerous areas and did so nearly every day following her transfer.

99.     Hospital records, including the daily census, showed the presence of active COVID cases in many of the units to which defendants assigned Sanders.

100.     On information and belief, other social workers raised concerns about defendants' decision to transfer Sanders. For example, on or about September 11, 2020, Sanders

learned that during a discussion with Frier, another social worker had protested Sanders's transfer due to her son's health. In response, Frier told the other social worker that Fraser-McCleary was, in sum and substance, "doing everything she could" with Labor Relations and Human Resources to place Sanders in the inpatient role.

101.    On information and belief, defendants transferred plaintiff to the new role as punishment for protected time she took to care for her son and for having to care for her sick son based on, inter alia, assumptions that in the future she would not be attentive to her job due to his health.

<u>Sanders Challenges the Transfer</u>

102.    On September 3, 2020, Sanders complained to the Office of Employee Labor Relations ("OELR") and met with Stephanie Bernadel ("Bernadel"), a Personnel Associate, regarding her transfer.

103.    Sanders told Bernadel, who was already aware of her son's medical condition, that she could not work on an inpatient floor.  Bernadel agreed with Sanders, replying, in sum and substance, "No, you cannot."

104.    However, on September 18, 2020, the OELR upheld the decision to transfer Sanders to an inpatient position via letter (the "OELR Determination"), based on several erroneous findings.

105.    OELR did not try to contact other transplant social workers who Sanders had identified as having information relevant to her complaint.

106.    First, contrary to the OELR Determination, Sanders had minimal experience with inpatient work and the work was much different than what she did as an outpatient social worker.

107.    For example, among numerous other demands, the inpatient role required Sanders to learn how to use a new computer system.

108.    It was especially difficult for Sanders to learn a new job while dealing with her son's serious health condition.

109.    Second, the OELR Determination stated erroneously that the transfer to the Inpatient Unit would not place Sanders at increased risk of COVID exposure. As set forth above, this was not the case.

110.    Third, the OELR Determination concluded that defendants transferred Sanders as part of the broader restructuring of the Social Work department that took place in January and February 2020, more than six months before defendants transferred Sanders.

111.    The OELR Determination stated that defendants delayed Sanders's transfer because the Transplant program was not re-opened until July 2020.  However, there were changes to the social work transplant roles in February 2020, including an expansion of Sanders's transplant social worker responsibilities.

112.    Furthermore, while defendants made changes to the Social Work department in February 2020, employees received no notice that more changes would happen later or that defendants were delaying taking certain steps.

113.    The unjustified decision to transfer Sanders to a position for which she had minimal experience was made only after Sanders took protected FMLA leave and expressed concern as a caregiver for her son, who had a disability, about the impact of the pandemic and her potential exposure to COVID.

<u>Defendants Deny Sanders's Requests for Reasonable Accommodations</u>

114.     In July 2020, Sanders began suffering from severe anxiety, experiencing panic attacks, and was diagnosed with Post-Traumatic Stress Disorder.

115.     On October 7, 2020, Sanders submitted a request for reasonable accommodations related to her anxiety and panic attacks to Downstate's ADA office.

116.     In support of her request for accommodations, Sanders included medical documentation.

117.     Sanders asked to be given a position that did not require her to enter patient rooms and to have the option to work from home in the event of a second wave of COVID, or, if those accommodations were not possible, to be transferred to another department.

118.     On October 9, 2020, Sanders asked Sharpe about the process via email.

119.     Sharpe informed Sanders that her request would be sent to her supervisors, Frier and Fraser-McCleary, and they would have seven days to either approve or deny the request.

120.     Later that same day, on October 9, 2020, Sanders informed Frier and Fraser-McCleary that they would be receiving her request for reasonable accommodations.

121.     On October 23, 2020, in response to Sanders's inquiry, Sharpe responded that she had not yet heard from the department and that if she did not receive a response by that day, she would have "other parties" reach out to Sanders's supervisors.

122.     On October 30, 2020, Sharpe sent Sanders an email stating that her accommodation request was under review as a final determination had not yet been reached.

123.     On November 12, 2020, over a month after Sanders gave her supervisors notice of her accommodations request, she had not received a final determination and sent another email to Sharpe inquiring about the status of her request.

124.    Sanders told Sharpe that earlier in the day on November 12, 2020, Sanders saw a patient on NS 82 and later learned that he was potentially COVID-positive. She told Sharpe that as a result, she was experiencing intense anxiety.

125.    On November 18, 2020, Sanders learned that defendants, including Fraser-McCleary, had denied her accommodations request.

126.    On November 18, 2020, Sharpe sent Sanders an email attaching a letter, dated November 16, 2020, denying her request for accommodations. The letter stated that defendants had denied Sanders's request not to enter patient rooms because her assignment to NS 82, a unit purportedly without COVID-positive patients, already constituted an accommodation.

127.    The letter was signed by Sharpe and copied Frier, Fraser-McCleary and Vice President of Human Resources John Siderakis.

128.    On information and belief, the letter's false characterization of the transfer as an accommodation was based on untrue statements that Fraser-McCleary made to senior management and the ADA office.

129.    The transfer to NS 82 was not an accommodation. Sanders did not request it, and, until, she received Sharpe's letter, no one had described the transfer as an accommodation.

130.    To the contrary, as Sanders told her supervisors, senior executives, Labor Relations, and the Office of Diversity and Inclusion, she opposed the transfer.

131.    Furthermore, as described above, COVID-positive patients were present on NS 82.

132.    Sharpe's November 2020 letter also stated that no transfers to other departments were available to Sanders at that time, but that she was free to apply for another position when one became available.

133.     By email dated December 10, 2020, Sanders requested that the ADA office reconsider its decision denying her accommodations request.

134.     Sanders did not hear anything from Sharpe or the ADA office regarding her request until mid-January 2021.

135.     Sharpe told Sanders via email on January 14, 2021 that she was meeting with her department heads regarding Sanders's concerns. Sanders never heard from her again despite following up on multiple occasions.

136.     Following the denial of her request for reasonable accommodations, Sanders was forced to quarantine twice in a three-week period, between December 2020 and January 2021, due to exposure to COVID in the Hospital.

Sanders Makes Additional Protected Complaints

137.     Downstate has an office called the Office of Diversity and Inclusion ("ODI"). According to Downstate's website, ODI "is responsible for ensuring Downstate's compliance with the State University of New York's employment policies and federal and state civil rights laws and regulations."

138.     On or about November 24, 2020, Sanders filed a complaint with ODI alleging that, inter alia, her transfer to a new inpatient social worker role was discriminatory and retaliatory.

139.     Sanders complained that the transfer was discriminatory based on, inter alia, her status as a caregiver and her association with a family member who is disabled.

140.     Sanders also complained that defendants had unlawfully denied her reasonable accommodation requests and that, following her protected discrimination complaints, defendants had retaliated against her.

141.    On or about December 2, 2020, ODI rejected Sanders's complaint because she purportedly did not articulate conduct that fell within the purview of ODI and, specifically, because she supposedly did not allege a violation of Downstate's antidiscrimination policy.

142.    On or about December 10, 2020, Sanders requested reconsideration of the ODI's determination.

143.    As she had done in her first complaint in November 2020, Sanders highlighted the disability discrimination and retaliation that defendants had forced her to endure.

144.    On or about February 11, 2021, ODI upheld its previous determination. ODI maintained that Sanders had not articulated a violation of Downstate's anti-discrimination policies but failed to explain how her complaints of disability discrimination were outside of ODI's purview.

145.    In addition to her ODI complaints, on or about November 23, 2020, Sanders complained to the Hospital's Chief Executive Officer, Dr. David Berger ("Berger"), about defendants' unlawful discrimination and retaliation.

146.    Berger told Sanders that she needed to "follow the chain of command" and connected her with the Hospital's Chief Operations Officer, Patricia Winston ("Winston").

147.    Sanders met with Winston on or about December 7, 2020. During the meeting, Sanders told Winston about the discriminatory treatment she had experienced.

148.    In response to Sanders's concerns, Winston promised to "get answers."

149.    During the meeting, Winston also told Sanders that she should consider not working in a hospital any longer due to her personal circumstances.

150.     Sanders sent Winston an email the day after their meeting and told her that she wished to continue her employment at Downstate, but that she needed a safe and respectful environment that was free of discrimination, harassment, and retaliation.

151.     Neither Berger nor Winston took steps to remedy the unlawful conduct.

<u>Defendants Continue to Discriminate and Retaliate Against Sanders</u>

152.     Following Sanders's additional protected complaints and request for accommodations, defendants, including Fraser-McCleary, escalated their discrimination and retaliation.

153.     Fraser-McCleary began subjecting Sanders to different standards than other social workers who were not disabled, who were not caregivers for their disabled family members, who did not request reasonable accommodations, and who did not make protected discrimination complaints.

154.     Beginning in or around early October 2020, Frier had permitted Sanders to arrive to work at 9:15 a.m. instead of her scheduled start time of 9:00 a.m. The additional 15 minutes in the morning allowed Sanders to, <u>inter alia</u>, administer her son's medications.

155.     After Sanders requested accommodations from the Hospital's ADA office in October 2020 based on her personal health condition and after she made protected complaints, Fraser-McCleary directed Frier to require Sanders to arrive by 9:00 a.m.

156.     In mid-October 2020, Frier told Sanders that Fraser-McCleary instructed her that Sanders was required to arrive at 9:00 a.m. or she would have to deduct the time from her FMLA allotment of leave time any time she arrived after 9:00 a.m.

157.    Frier also told Sanders that Fraser-McCleary said she would not permit Sanders to modify her schedule to change her start time.  Fraser-McCleary said that doing so would be "reward[ing] chronic lateness."

158.    In over 11 years working for Downstate, no one had ever accused Sanders of chronic lateness.

159.    In contrast to their treatment of Sanders, defendants permitted other social workers to adjust their work schedules for non-medical reasons, and the start times for other social workers varied widely based on what was most convenient for them.

160.    Since defendants transferred Sanders, Fraser-McCleary has attempted to force Sanders to leave or tried to build a case to justify firing Sanders by setting her up to fail.

161.    After forcing Sanders into a new job for which she had little experience and no training, Fraser-McCleary criticized her performance.

162.    For example, within weeks after Sanders started her new job, Fraser-McCleary described her as unprepared and resistant during daily rounds in front of other employees.

<u>Sanders Files an EEOC Charge and Defendants' Retaliation Continues</u>

163.    Sanders filed a charge with the Equal Employment Opportunity Commission ("EEOC") in September 2021 (the "September 2021 EEOC Charge"), alleging that defendants unlawfully denied her request for reasonable accommodations for her disability; discriminated against her based on her personal disability and her association with a person with a disability; and retaliated against her based on her request for reasonable accommodations and for her protected discrimination complaints.

164.    After Sanders filed the September 2021 EEOC Charge, defendants

continued to assign her to floors where patients had tested positive for COVID.

165.    For example, on December 28, 2021, Downstate admitted a patient to NS 82; the patient was having difficulty breathing and was unvaccinated. The following day, on December 29, 2021, that patient tested positive for COVID.

166.    Downstate also transferred two patients to NS 82 after COVID exposure in the Medical Intensive Care Unit ("MICU") on December 6 and 8, 2021.

167.    Also, defendants assigned her to NS 72, where there have been numerous patients who had tested positive for COVID, on multiple occasions.

168.    In addition, defendants assigned Sanders several times to NS 81, where there were at least 14 COVID-positive patients in December 2021.

169.    On December 30, 2021, Sanders received a call from Frier, who told her that Downstate was transferring Sanders from her assignment on NS 81, where there were 14 COVID patients, to NS 72, where there were "only two" such cases.

170.    Frier further stated, in sum and substance, "I was told I had to move you."

            Sanders is Exposed to Covid as a Result of Her Transfer

171.    As a result of defendants' refusal to accommodate Sanders's reasonable requests to work remotely, both Sanders and her son, who is at an elevated risk of complications associated with COVID-19, tested positive for COVID in January 2022.

172.    Even though Sanders suffers from conditions, including severe anxiety, panic attacks, and PTSD, which are directly related to exposure to COVID, defendants continued to assign her to units with active COVID patients when she returned to work following her recovery from COVID.

173.    For example, in January and February 2022, in addition to NS 82,

defendants assigned Sanders to NS 72 and NS 33. Downstate assigned her to NS 72 at a time when there were at least eight COVID positive patients there.

174.     Also, while Sanders was working on NS 82 on or about March 30, 2022, Downstate confirmed the presence of a COVID positive patient there. The patient's COVID status was discovered accidentally prior to a procedure on March 29, 2022 and after staff had been exposed for several days.

Downstate Refuses to Transfer Sanders to an Open Position

175.     As set forth above, Sanders worked as an outpatient transplant social worker from the time of her hiring in 2009 until September 2020, when defendants transferred her to an inpatient role despite her objections.

176.     The outpatient transplant social worker job involves far less risk of exposure to COVID than did the inpatient role.

177.     At the height of Coronavirus Omicron variant outbreak, all employees working with transplant patients on an outpatient basis were seeing them remotely.

178.     The social worker who was assigned to Sanders's former position on the outpatient transplant team left Downstate in October 2021. That position remained unfilled until February 2022.

179.     Even when there was a position on the outpatient team where Sanders would have had a greater degree of safety, either by seeing patients remotely or by seeing them in an outpatient setting, and for which she was highly qualified based on over 10 years of experience, defendants declined to return her to her former position.

180.     Defendants' harassment, discrimination, and retaliation are ongoing and have created an environment that make it nearly impossible for Sanders to perform her job.

<u>FIRST CAUSE OF ACTION</u>
FMLA – Retaliation
(Against Downstate and Fraser-McCleary in Her Official Capacity)

181.    Plaintiff repeats and realleges paragraphs 1 through 180 as if fully set forth herein.

182.    By the acts and practices described above, defendants have retaliated against plaintiff for exercising her rights, in violation of the FMLA, 29 U.S.C. § 2615.

183.    Individual defendant Fraser-McCleary had supervision and control over the conditions of plaintiffs employment, including whether to transfer her to a new position and whether to approve or reject her requests for accommodations, and firing authority with respect to her employment.

184.    Fraser-McCleary also had supervision and control over the employment conditions of, and hiring and firing authority with respect to, other Downstate employees.

185.    Defendants knew that their actions violated the FMLA. Defendants' violations of the FMLA were willful and not in good faith.

186.    As a result of defendants' violations, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

<u>SECOND CAUSE OF ACTION</u>
Rehabilitation Act – Disability Discrimination
(Against Downstate)

187.    Plaintiff repeats and realleges paragraphs 1-186 as if fully set forth herein.

188.    By the acts and practices described above, Downstate, a program or activity receiving federal financial assistance, discriminated against plaintiff in the terms and conditions of her employment, including subjecting her to a hostile work environment, on the basis of her

disability and her association with a person with a disability, in violation of the Rehabilitation Act.

189.    Downstate acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

190.    As a result of Downstate's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

<u>THIRD CAUSE OF ACTION</u>
Rehabilitation Act: Retaliation
(Against Downstate)

191.    Plaintiff repeats and realleges paragraphs 1-190 as if fully set forth herein.

192.    By the acts and practices described above, Downstate, a program or activity receiving federal financial assistance, retaliated against plaintiff in the terms and conditions of her employment, including subjecting her to a hostile work environment, for requesting a reasonable accommodation and for opposing unlawful employment practices, in violation of the Rehabilitation Act.

193.    Downstate acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

194.    As a result of Downstate's retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

<u>FOURTH CAUSE OF ACTION</u>
Rehabilitation Act: Failure to Accommodate
(Against Downstate)

195.    Plaintiff repeats and realleges paragraphs 1 through 194 above.

196.     By the acts and practices described, SUNY Downstate, a program or activity receiving federal financial assistance, discriminated against plaintiff in the terms and conditions of her employment and deprived her of her rights under the law, in violation of the Rehabilitation Act.

197.     Plaintiff has had, at all relevant times, a "disability" as that term is defined in the Rehabilitation Act.  Plaintiff was able to perform the essential functions of the job with a reasonable accommodation, and therefore was at all relevant times a "qualified individual with a disability" within the meaning of the Rehabilitation Act. Downstate had notice of plaintiff's disability.

198.     With reasonable accommodations, plaintiff could have performed the essential functions of her job and Downstate refused to make such accommodations.

199.     Downstate has acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

200.     As a result of Downstate's discriminatory acts, plaintiff has suffered and will continue to suffer economic losses, irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

<u>FIFTH CAUSE OF ACTION</u>
ADA: Discrimination
(Against Fraser-McCleary in her Official Capacity)

201.     Plaintiff repeats and realleges paragraphs 1 through 200 as if fully set forth herein.

202.     By the acts and practices described above, Fraser-McCleary discriminated against plaintiff in the terms and conditions of her employment on the basis of her disability and her association with a person with a disability and deprived her of her rights under the ADA.

27

203.    As a result of Fraser-McCleary's unlawful acts, plaintiff has suffered and will suffer irreparable injury unless and until this Court grants injunctive relief.

SIXTH CAUSE OF ACTION
ADA: Retaliation
(Against Fraser-McCleary in her Official Capacity)

204.    Plaintiff repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

205.    By the acts and practices described above, Fraser-McCleary retaliated against plaintiff in the terms and conditions of her employment because of her protected activities, including, inter alia, her requests for a reasonable accommodation for her disability and for engaging in protected activities, in violation of the ADA.

206.    As a result of Fraser-McCleary's unlawful acts, plaintiff has suffered and will suffer irreparable injury unless and until this Court grants injunctive relief.

SEVENTH CAUSE OF ACTION

Rehabilitation Act: Failure to Accommodate
(Against Fraser-McCleary in her Official Capacity)

207.    Plaintiff repeats and realleges paragraphs 1 through 206 above.

208.    By the acts and practices described, Fraser-McCleary discriminated against plaintiff in the terms and conditions of her employment and deprived her of her rights under the law, in violation of  the ADA.

209.    Plaintiff has had, at all relevant times, a "disability" as that term is defined in the Rehabilitation Act.  Plaintiff was able to perform the essential functions of the job with a reasonable accommodation, and therefore was at all relevant times a "qualified individual with a disability" within the meaning of the ADA. Fraser-McCleary had notice of plaintiff's disability.

210.    With reasonable accommodations, plaintiff could have performed the essential functions of her job and Fraser-McCleary refused to make such accommodations.

211.    Fraser-McCleary has acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

212.    As a result of Fraser-McCleary's discriminatory acts, plaintiff has suffered and will continue to suffer economic losses, irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

EIGHTH CAUSE OF ACTION
Executive Law – Disability Discrimination
(Against Fraser-McCleary in Her Individual Capacity)

213.    Plaintiff repeats and realleges paragraphs 1 through 212 of this Complaint as if fully set forth herein.

214.    By the acts and practices described above, Fraser-McCleary has discriminated against plaintiff in the terms and conditions of her employment, including subjecting her to a hostile work environment, on the basis of her disability and her association with a person with a disability, in violation of the Executive Law.

215.    Fraser-McCleary is liable under the Executive Law as plaintiff's employer.

216.    Fraser-McCleary is liable for aiding and abetting Downstate's unlawful acts under the Executive Law.

217.    Fraser-McCleary, plaintiff's superior, has had supervision and control over the conditions of plaintiff's employment and firing authority with respect to plaintiff's employment.  Fraser-McCleary participated in the discriminatory conduct against plaintiff by, inter alia, transferring her to a new position and refusing to accommodate her disability.

218.     As a result of Fraser-McCleary's discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

219.     Fraser-McCleary has acted intentionally and with malice or reckless indifference to plaintiff's statutorily protected rights.

NINTH CAUSE OF ACTION
Executive Law: Failure to Accommodate
(Against Fraser-McCleary in Her Individual Capacity)

220.     Plaintiff repeats and realleges paragraphs 1 through 219 above.

221.     Plaintiff has had, at all relevant times, a "disability" as that term is defined in the Executive Law.  Plaintiff was able to perform the essential functions of the job with a reasonable accommodation, and therefore was at all relevant times an "individual with a disability" within the meaning of the Executive Law. Fraser-McCleary had notice of plaintiff's disability.

222.     Fraser-McCleary is liable under the Executive Law as plaintiff's employer.

223.     Fraser-McCleary is liable for aiding and abetting Downstate's unlawful acts under the Executive Law.

224.     Fraser-McCleary, plaintiff's superior, has had supervision and control over the conditions of plaintiff's employment and firing authority with respect to plaintiff's employment.

225.     With reasonable accommodation, plaintiff could have performed the essential functions of her job.  Fraser-McCleary participated in the discriminatory conduct against plaintiff by, inter alia, refusing to accommodate her disability.

226.    Fraser-McCleary has acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

227.    As a result of Fraser-McCleary's discriminatory acts, plaintiff has suffered and will continue to suffer economic losses, irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

TENTH CAUSE OF ACTION
Executive Law- Retaliation
(Against Fraser-McCleary in her Individual Capacity)

228.    Plaintiff repeats and realleges paragraphs 1 through 227 as if fully set forth herein.

229.    By the acts and practices described above, Fraser-McCleary retaliated against plaintiff in the terms and conditions of her employment for engaging in protected activities, including, inter alia, her requests for a reasonable accommodation and for her opposing unlawful employment practices, in violation of the Executive Law.

230.    Fraser-McCleary is liable under the Executive Law as plaintiff's employer.

231.    Fraser-McCleary is liable for aiding and abetting Downstate's unlawful acts under the Executive Law.

232.    Fraser-McCleary, plaintiff's superior, has had supervision and control over the conditions of plaintiff's employment and firing authority with respect to plaintiff's employment.  Fraser-McCleary participated in the retaliatory conduct against plaintiff by, inter alia, transferring her to a new position and refusing to accommodate her disability.

233.    Fraser-McCleary acted with malice and reckless indifference to plaintiff's rights under the Executive Law.

234.    As a result of Fraser-McCleary's retaliation, plaintiff has suffered and will

continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

ELEVENTH CAUSE OF ACTION
City Law – Disability and Caregiver Discrimination
(Against Fraser-McCleary in her Individual Capacity)

235.    Plaintiff repeats and realleges paragraphs 1 through 234 of this Complaint as if fully set forth here.

236.    By the acts and practices described above, Fraser-McCleary has discriminated against plaintiff in the terms and conditions of her employment, including subjecting her to a hostile work environment, on the basis of her disability, association with a person with a disability, and caregiver status, in violation of the City Law.

237.    Fraser-McCleary is liable under the City Law as plaintiff's employer.

238.    Fraser-McCleary is liable for aiding and abetting Downstate's unlawful acts under the City Law.

239.    Fraser-McCleary, plaintiff's superior, has had supervision and control over the conditions of plaintiff's employment and firing authority with respect to plaintiff's employment.  Fraser-McCleary participated in the discriminatory conduct against plaintiff by, inter alia, transferring her to a new position and refusing to accommodate her disability.

240.    As a result of Fraser-McCleary's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

241.    In addition, plaintiff is entitled to punitive damages and other remedies as may be appropriate under the City Law.

## TWELFTH CAUSE OF ACTION
City Law: Failure to Accommodate
(Against Fraser-McCleary in Her Individual Capacity)

242.    Plaintiff repeats and realleges paragraphs 1 through 241 above.

243.    Plaintiff has had, at all relevant times, a "disability" as that term is defined in the City Law.  Plaintiff was able to perform the essential functions of the job with a reasonable accommodation, and therefore was at all relevant times an "individual with a disability" within the meaning of the City Law. Fraser-McCleary had notice of plaintiff's disability.

244.    Fraser-McCleary is liable under the City Law as plaintiff's employer.

245.    Fraser-McCleary is liable for aiding and abetting Downstate's unlawful acts under the City Law.

246.    With reasonable accommodation, plaintiff could have performed the essential functions of her job.

247.    Fraser-McCleary participated in the discriminatory conduct against plaintiff by, inter alia, refusing to make such accommodations and/or failing to engage in a good faith individualized, interactive process to consider a reasonable accommodation.

248.    As a result of Fraser-McCleary's discriminatory acts, plaintiff has suffered and will continue to suffer economic losses, irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

249.    In addition, plaintiff is entitled to punitive damages and other remedies as may be appropriate under the City Law.

## THIRTEENTH CAUSE OF ACTION
City Law – Retaliation
(Against Fraser-McCleary in Her Individual Capacity)

250.    Plaintiff repeats and realleges paragraphs 1 through 249 as if fully set forth

herein.

251.    By the acts and practices described above, Fraser-McCleary retaliated against plaintiff in the terms and conditions of her employment, including subjecting her to a hostile work environment, because she engaged in protected activities, including, _inter alia_, requesting reasonable accommodations and opposing unlawful employment practices, in violation of the City Law.

252.    Fraser-McCleary is liable under the City Law as plaintiff's employer.

253.    Fraser-McCleary is liable for aiding and abetting Downstate's unlawful acts under the City Law.

254.    Fraser-McCleary, plaintiff's superior, has had supervision and control over the conditions of plaintiff's employment and firing authority with respect to plaintiff's employment. Fraser-McCleary participated in the retaliatory conduct against plaintiff by, _inter alia_, transferring her to a new position and refusing to accommodate her disability.

255.    As a result of Fraser-McCleary's retaliation, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

256.    In addition, plaintiff is entitled to punitive damages and other remedies as may be appropriate under the City Law.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment:

a.      Declaring that defendants' acts and practices complained of herein violates plaintiff's rights under the FMLA, Rehabilitation Act, ADA, Executive Law, and City Law.

b.      Enjoining and permanently restraining defendants from violating the FMLA, Rehabilitation Act, ADA, Executive Law, and City Law.

c.      Directing defendants to tale such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities.

d.      Directing defendants to reinstate plaintiff to the position that she would have occupied had she not been subject to discrimination and retaliation;

e.      Directing defendants to make plaintiff whole for all earnings and other benefits she would have received but for defendants' discriminatory and retaliatory treatment, including, but not limited to, wages and other lost benefits;

f.      Directing defendants to pay plaintiff compensatory damages for her mental anguish and humiliation and damage to reputation;

g.      Directing defendants to pay plaintiff punitive damages for their intentional disregard of and/or reckless indifference to plaintiff's statutory rights;

h.      Directing defendants to pay plaintiff liquidated damages pursuant to 29 U.S.C. § 2617(a).

i.      Directing defendants to pay plaintiff's reasonable attorneys' fees, costs, and disbursements;

j.      Directing defendants to compensate plaintiff for any adverse tax consequences;

k.      Directing defendants to pay prejudgment interest; and

l.      Granting such other and further relief as this Court deems necessary and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a

trial by jury in this action.

Dated: New York, New York
July 14, 2022

VLADECK, RASKIN & CLARK, P.C.

By: _____

Jeremiah Iadevaia
Susanna Barron
Attorneys for Plaintiff
565 Fifth Avenue, 9th Floor
New York, New York 10017
(212) 403-7300