UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
SUSAN SANDERS,

                        Plaintiff,

        -against-                                                    **ORDER**
                                                            22 CV 4139 (KAM) (CLP)
SUNY DOWNSTATE MEDICAL CENTER
and SUSAN FRASER-MCLEARY,

                        Defendants.
--------------------------------------------------------X
**POLLAK**, United States Magistrate Judge:

        On July 14, 2022, plaintiff Susan Sanders commenced this action against defendants

SUNY Downstate Medical Center ("Downstate") and Susan Fraser-McCleary ("Fraser-

McCleary") (collectively, "defendants"), alleging claims of workplace discrimination, failure to

accommodation, and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. §§

2601 et seq. ("FMLA"), the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq. ("Rehab Act"),

the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), the New York State

Human Rights Law, N.Y. Exec. L. §§ 296 et seq. ("NYSHRL"), and the Administrative Code of

the City of New York, §§ 8-107 et seq. ("NYCHRL").  (Am. Compl. [1] ¶¶ 1–8).

        Currently pending before the Court are the parties' respective letter motions relating to

outstanding discovery disputes.  (ECF Nos. 41, 42).  For the reasons set forth below, plaintiff's

motion is granted in part and denied in part, and defendants' motion is granted in part and denied

in part.[2]

---

[1] Citations to "Am. Compl." refer to plaintiff's first Amended Complaint, filed on June 9, 2023 (ECF No. 27).

[2] Also pending before the undersigned is plaintiff's Motion to Amend the first Amended Complaint (ECF No. 48).  That motion is currently under advisement, and it will be addressed in a separate Order.

<u>BACKGROUND</u>

Plaintiff Susan Sanders alleges that she began her employment at Downstate's University Hospital of Brooklyn in 2009 as an outpatient social worker in the Transplant Program. (Am. Compl. ¶¶ 1, 23). Plaintiff is also the primary caregiver to her son, who lives with Ulcerative Colitis, an inflammatory bowel disease. (Id. ¶¶ 43-44). Plaintiff's son has undergone extensive treatment for his condition, requiring her to take leave under the Family and Medical Leave Act ("FMLA") to care for him. (Id. ¶¶ 43, 47-60). In addition to taking FMLA leave, plaintiff also submitted requests to work from home in order to care for her son and mitigate the risk of exposing him to the COVID-19 virus. (Id. ¶¶ 61-69).

When she returned from FMLA leave in July 2020, plaintiff was informed by her supervisors, defendant Fraser-McCleary and Social Work Supervisor Heather Frier, that she had been reassigned to the Hospital's inpatient unit, effective September 21, 2020. (Id. ¶¶ 81, 83-86). Plaintiff alleges that the transfer was retaliation for the protected FMLA leave she had taken from work, and that the transfer increased her and her son's risk of exposure to the COVID-19 virus and other contagious diseases. (Id. ¶¶ 2, 88, 102). Defendants deny these allegations, admitting only that part of its 2020 restructuring included transitioning from a "team-based model to a unit-based model, which required the social work department to transfer several of its social workers." (Defs.' Am. Answer[3] ¶ 39).

In July 2020, plaintiff alleges she began suffering from severe anxiety and panic attacks, and she was subsequently diagnosed with Post-Traumatic Stress Disorder. (See Am. Compl. ¶¶ 115, 116-117). Plaintiff alleges that her symptoms were heightened after her transfer to the inpatient position, particularly when she had to enter patient rooms. (Id. ¶¶ 118, 119).

---

[3] Citations to "Defs.' Am. Answer" refer to defendants' Amended Answer to plaintiff's Amended Complaint, filed on December 13, 2023 (ECF No. 37).

Following her transfer, plaintiff made requests for accommodations, lodged formal complaints, and met with senior Hospital administrators regarding her transfer.  (See id. ¶¶ 101–105, 122-124, 132, 133, 145-151, 152-157).  In or around early October 2020, plaintiff alleges that Frier began permitting plaintiff to arrive at work 15 minutes later than her scheduled start time so that she could administer her son's medication in the morning.  (Id. ¶ 161).  Later that month, after plaintiff requested accommodations from the Hospital's ADA office, plaintiff alleges defendant Fraser-McCleary revoked the courtesy Frier had extended to plaintiff, directing her to arrive at work by 9:00 a.m. or use FMLA leave.  (Id. ¶¶ 162, 163).  On September 13, 2021, plaintiff filed a complaint against Downstate with the United States Equal Employment Opportunity Commission ("EEOC").  (Id. ¶ 11).

The parties have filed competing motions relating to certain discovery disputes that they have been unable to resolve themselves.  (ECF Nos. 41, 42).  Among other things, they disagree on the inclusion of one ESI custodian and the propriety of certain electronically stored information ("ESI") searches.  In addition, the parties move to compel responses to Requests for Documents ("Document Requests" or "RFPs") and Interrogatories ("Interrogs.") on a range of topics.

DISCUSSION

I.   <u>Legal Standard</u>

Federal Rule of Civil Procedure 26(b)(1) governs the scope of discovery in federal cases. Rule 26(b)(1) allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Relevancy under Rule 26 has been "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in th[e] case."  <u>Giacchetto v. Patchogue-Medford Union Free Sch. Dist.</u>, 293 F.R.D. 112, 114

3

(E.D.N.Y. May 6, 2013) (internal quotation marks omitted) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).  While Rule 26(b) was amended in 2015 to move the proportionality language to the provision defining the scope of discovery, "[t]he 2015 amendment[ ] . . . did not establish a new limit on discovery." ValveTech, Inc. v. Aerojet Rocketdyne, Inc., No. 17 CV 6788, 2021 WL 630910, at *2 (W.D.N.Y. Feb. 18, 2021); see also Robertson v. People Mag., No. 14 CV 6759, 2015 WL 9077111, at *2 (S.D.N.Y. Dec. 16, 2015) (explaining that the amendment "serves to exhort judges to exercise their preexisting control over discovery more exactingly"); Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment (explaining that "[r]estoring the proportionality calculation to Rule 26(b)(1) does not change the existing responsibilities of the court and the parties to consider proportionality"). Accordingly, Rule 26 as amended "constitute[s] a reemphasis on the importance of proportionality in discovery but not a substantive change in the law." Carl v. Edwards, No. 16 CV 3863, 2017 WL 4271443, at *2 (E.D.N.Y. Sept. 25, 2017) (internal quotation marks omitted) (quoting Vaigasi v. Solow Mgmt. Corp., No. 11 CV 5088, 2016 WL 616386, at *13 (S.D.N.Y. Feb. 16, 2016)).

Nevertheless, while the scope of discovery is "broad," it is not "limitless." Fears v. Wilhelmina Model Agency, Inc., No. 02 CV 4911, 2004 WL 719185, at *1 (S.D.N.Y. Apr. 1, 2004).  The party seeking discovery must show that it is not engaging in "merely a fishing expedition." Carl v. Edwards, 2017 WL 4271443, at *3 (internal quotation marks omitted) (quoting Barbara v. MarineMax, Inc., No. 12 CV 368, 2013 WL 1952308, at *2 (E.D.N.Y. May 10, 2013)).  Rule 26 requires courts to limit the extent of discovery where "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i).

II.   <u>Proportionality</u>

Defendants assert a general objection to the scope of ESI discovery that plaintiff requests

in this case, arguing that because this is a single plaintiff alleging individual discrimination and

retaliation claims against a single defendant, "[b]road discovery is therefore not warranted."

(Defs.' Opp.[4] at 2 (citing <u>Chen-Oster v. Goldman, Sachs & Co.</u>, 293 F.R.D. 557, 561–62, 567

(S.D.N.Y. Oct. 15, 2013)).  Yet "broad" is a relative term.  While the court in <u>Chen-Oster v.</u>

<u>Goldman, Sachs & Co.</u> noted that  "[b]roader discovery" is called for where "a plaintiff's claims

are premised on a pattern or practice of discrimination at the organization-wide level," the court

did not explicitly define the acceptable breadth of discovery in single-plaintiff employment

discrimination cases.[5]  <u>See</u> 293 F.R.D. at 567.

For good reason, courts have been reluctant to draw lines in the sand on the appropriate

quantity of discovery in single-plaintiff employment discrimination cases, and just as often,

courts have allowed broad discovery in cases similar to this one.  <u>See, e.g.</u>, <u>Bagley v. Yale Univ.</u>,

307 F.R.D. 59, 63-67 (D. Conn. 2015) (declining to grant a protective order to relieve defendants

of having to review an additional 43,000 documents, where their initial round of ESI searches

had already produced roughly 38,000 separate documents).  "The mere fact that many documents

have already been produced is not sufficient to establish that there are no other relevant materials

---

[4] Citations to "Defs.' Opp." refer to defendants' letter in opposition to plaintiff's letter motion to compel, filed on February 20, 2024 (ECF No. 44).

[5] In arguing that plaintiff's discovery requests far exceed the standard of discovery in similar discrimination cases, defendants cite <u>Vaigasi v. Solow Mgmt. Corp.</u>, which held that, where defendants produced approximately 1,000 pages of documents in response to plaintiff's first set of document requests, the "volume of defendants' production is within the range of what is normally seen in similar cases."  2016 WL 616386, at *14.  In that case, the Court's decision to deny plaintiff's second document request was not premised on the volume of documents previously produced, but on the fact that the second request was both procedurally and substantively deficient.  <u>Id.</u> at *11 (holding that "[i]n addition to the procedural defects in plaintiff's motion, the underlying document requests are defective for three [sic] reasons: (1) they are irrelevant; (2) even if the requests have some relevance, they are disproportionate to the claims remaining in the case; (3) they are overbroad and (4) they are unduly burdensome").

to be found." <u>Family Wireless #1, LLC v. Automotive Techs., Inc.</u>, No. 15 CV 1310, 2016 WL 2930887, at *3 (D. Conn. May 19, 2016) (internal citations omitted).

Once the party seeking discovery has demonstrated relevance, the burden shifts to the responding party to justify limitations. <u>AIU Insurance Co. v. TIG Insurance Co.</u>, No. 07 CV 7052, 2008 WL 5062030, at *9 (S.D.N.Y. Nov. 25, 2008). "[T]he objecting party must show specifically how, despite the broad and liberal construction afforded [sic] the federal discovery rules, each request is not relevant or how each question is overly broad, burdensome or oppressive." <u>Chen-Oster v. Goldman, Sachs & Co.</u>, 293 F.R.D. at 561 (internal citations and quotation marks omitted) (citing <u>Tourtelotte v. Anvil Place Master Tenant, LLC</u>, No. 11 CV 1454, 2012 WL 5471855, at *1 (D. Conn. Nov. 9, 2012)). That the moving party may have a number of relevant discovery requests does not, by itself, absolve the responding party of their burden of demonstrating that each individual request is either irrelevant or overly broad, burdensome, or oppressive. Accordingly, each discovery dispute is dealt with below.

III.    <u>Electronically Stored Information</u>

A.    <u>Legal Standard</u>

Under the Federal Rules of Civil Procedure, a party is required to produce electronically stored information, subject to the same relevancy and proportionality limitations set forth in Rule 26(b). <u>See</u> Fed. R. Civ. P. 34. The Court's "broad discretion to manage the discovery process include[s] determinations regarding which search terms a party should apply." <u>Hernandez v. NHR Human Res., LLC</u>, No. 20 CV 3109, 2021 WL 2535534, at *20 (S.D.N.Y. June 18, 2021) (internal citations and quotation marks omitted); <u>see also</u> <u>Raine Grp. LLC v. Reign Cap., LLC</u>, No. 21 CV 1898, 2022 WL 538336, at *3 (S.D.N.Y. Feb. 22, 2022) (revising parties' list of disputed search terms); <u>Emanuel v. Gap, Inc.</u>, No. 19 CV 3617, 2020 WL 5995134, at *2-3 (S.D.N.Y. Oct. 9, 2020) (denying appeal of magistrate judge's determinations regarding

which search terms to apply while citing a magistrate judge's "broad discretion to manage the discovery process"). "Of course, the best solution in the entire area of electronic discovery is cooperation among counsel." Bagley v. Yale Univ., 307 F.R.D. at 63 (internal quotation marks omitted) (quoting William A. Gross Constr. Assocs., Inc. v. American Mfrs. Ins. Co., 256 F.R.D. 134, 136 (S.D.N.Y. 2009)).

      B.    The Disputed ESI Custodian

The parties have agreed to conduct searches relating to eight ESI custodians: plaintiff Susan Sanders, defendant Susan Fraser-McCleary, Social Work Supervisor Heather Frier, ADA Ethics Analyst and Associate to the Assistant Vice President Nicole Sharpe, Assistant Vice President of Human Resources Anthony Parker, Personnel Associate Stephanie Bernadel, Chief Operations Officer Patricia Winston, and Supervisor Felicia Thompson. (See Defs.' Ltr.[6] at 4). The parties do not agree, however, as to whether Downstate's Chief Executive Officer, Dr. David Berger ("Dr. Berger"), should be included as an ESI custodian.

Plaintiff argues that Dr. Berger is an appropriate custodian because "[p]laintiff made a protected complaint of unlawful discrimination and retaliation to him and then had a meeting with him about her complaint." (Pl.'s Ltr.[7] at 10). Defendants counter that, with regards to the emails of senior executives, such as Dr. Berger, the party seeking discovery must demonstrate that the executives are "likely to be the exclusive holders of responsive documents." (Defs.' Ltr. at 6 (quoting In re Morgan Stanley Mortgage Pass-Through Certificates Litig., No. 09 CV 2137, 2013 WL 4838796, at *2 (S.D.N.Y. Sept. 11, 2013))). Defendants argue that Dr. Berger is not an appropriate ESI custodian because "[p]laintiff cannot show that Dr. Berger's emails are

---

[6] Citations to "Defs.' Ltr." refer to defendants' letter motion to compel, filed on February 12, 2024 (ECF No. 41).
[7] Citations to "Pl.'s Ltr." refer to plaintiff's letter motion to compel, filed on February 12, 2024 (ECF No. 42).

relevant at all, much less that Dr. Berger is likely to be the exclusive holder of any relevant

information."  (Defs.' Ltr. at 7).

First, the two cases that defendants rely upon to support their argument involved

securities actions, and each featured vastly more custodians – plaintiffs sought 80 and 72

custodians, respectively.  See In re Morgan Stanley Mortgage Pass-Through Certificates Litig.,

2013 WL 4838796, at *1; Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co., 297

F.R.D. 99, 105 (S.D.N.Y. 2013).  In both cases, the courts held that while the custodians whose

records were sought based on seniority alone were not appropriate custodians, those senior

executives whose names were included on working group lists related to the litigation were

eligible.  See In re Morgan Stanley Mortgage Pass-Through Certificates Litig., 2013 WL

4838796, at *2 (requiring defendants to include an executive director as a custodian because

"Ms. Gilly appears on the working group lists for the Offerings"); Fort Worth Employees' Ret.

Fund v. J.P. Morgan Chase & Co., 297 F.R.D. at 105 (holding that "[t]he presence of these

proposed custodians on the working group lists is sufficient to establish that their inclusion in

ESI searches is reasonably calculated to lead to relevant evidence that might not be captured if

they were excluded").

In this instance, plaintiff does not seek to include Dr. Berger as a custodian merely

because of his position as Downstate's CEO, but because she corresponded with him via email,

then met with him personally to discuss her complaints.  (Pl.'s Opp.[8] at 6).  Not only is Dr.

Berger's involvement in the case greater than that of the senior executives whose names were

featured on working lists in the securities actions cited by defendants, but it is also plausible that

Dr. Berger may have made references to the plaintiff in correspondence he exchanged with other

---

[8] Citations to "Pl.'s Opp." refer to plaintiff's letter in opposition to the defendants' letter motion to compel, filed on February 20, 2024 (ECF No. 45).

non-custodial colleagues after meeting with plaintiff about her complaint.  Furthermore, to the extent that defendants argue that plaintiff has failed to show that Dr. Berger is the "exclusive holder of any relevant information" (Defs.' Ltr. at 7), defendants have provided no information indicating any person with whom Dr. Berger may have discussed the plaintiff or her complaint. Finally, plaintiff has limited her search requests regarding Dr. Berger's ESI to three of her proposed searches (Pl.'s Ltr. at 10; Pl.'s Opp. at 6), demonstrating a good faith attempt to limit the scope of discovery to what may be relevant to this case and to avoid unduly burdening defendants.  Accordingly, the Court Orders Dr. Berger to be included as an ESI custodian for the limited searches proposed by plaintiff.

      C.     <u>Specific Search Requests</u>

Thus far, the parties have engaged in extensive negotiations regarding ESI, agreeing to eleven searches on eight custodians that generated hits on 4,517 documents.  (Defs.' Ltr. at 4). The parties have reached an impasse on nine further searches (<u>id.</u>), and now turn to the Court for a resolution.

Plaintiff requests nine additional searches that hit 14,475 additional documents without families[9] and 35,837 with families.  (Defs.' Table[10]).  Defendants counter with eight searches resulting in 2,122 documents without families and 4,227 documents with families.  (<u>Id.</u>)  The Court notes that plaintiff has consented to defendants searching only hits without families, provided that if any of those hits are responsive, defendants will produce the entire document,

---

[9] The Court notes that, as used in the context of ediscovery, a file or document "family" consists of a primary file (the "parent") and other associated or secondary files (the "children").  <u>See</u> Anita Mathai, <u>What Are eDiscovery File Families? And Should I Be Protecting Them?</u>, GoldFynch, (Sept. 4, 2019), https://goldfynch.com/blog/2019/09/04/what-are-ediscovery-file-families-and-should-i-be-protecting-them.html.  A common example is an email with attachments – the email would be the parent, the attachments would be the children, and the entire group is the family.  (<u>Id.</u>)

[10] Citations to "Defs.' Table" refer to the table of the parties' disputed additional searches, filed on February 12, 2024, as Exhibit E to defendants' letter motion to compel (ECF No. 41-5).

including any attachments.  (Pl.'s Ltr. at 8).  For the sake of simplicity, the Court limits its analysis to hits without families.  The Court also replicates the numbering used in defendants' table of the parties' disputed searches, identifying the searches using Nos. 1–9.  (Defs.' Table).  The Court now addresses each in turn.

       1.    <u>Search No. 1</u>

Plaintiff seeks communications from a limited number of custodians that mention her by last name, exclude her as a sender or a recipient, and exclude another employee with the same last name.  (Defs.' Table).  Defendants object to this search entirely, arguing that the search is "overly broad and does not relate to specific topics in this case."  (Defs.' Opp.[11] at 3).  Plaintiff argues that emails and attachments mentioning her by name are "directly relevant to the case as they likely contain communications regarding, <u>inter alia</u>, [d]efendants' decisions not to permit [p]laintiff to work from home and to transfer [her] to an inpatient facility, and [her] protected complaints."  (Pl.'s Ltr. at 7).

As currently formulated, Search No. 1 is overly broad.  This Court has previously noted that ESI searches of any and all communications between managers regarding a plaintiff are overly broad – such searches must be narrowed down to "communications between specific individuals concerning specific topics that relate to [a] case."  <u>Babbitt v. Koeppel Nissan, Inc.</u>, No. 18 CV 5242, 2019 WL 3296984, at *2 (E.D.N.Y. July 23, 2019).  As discussed below, plaintiff's proposed Search Nos. 2–9 achieve just this by narrowing the questions to relevant topics that are proportional to the needs of the case.  Without any attempt to limit the search to the topics of the case, Search No. 1 would make these proposed searches, and the previously

---

[11] Citations to "Defs.' Opp." refer to defendants' letter in opposition to plaintiff's letter motion to compel, filed on February 20, 2024 (ECF No. 44).

agreed upon searches, largely redundant.  Accordingly, plaintiff's motion to compel Search No. 1 is denied.

      2.   <u>Search No. 2</u>

Search No. 2 seeks communications where "Sanders" is within 20 words of roughly 20 terms relating to plaintiff's son, his medical conditions, and her caregiving duties.  (Defs.' Table).  Plaintiff's proposed Search No. 2 uses "OR" connectors, requiring only "Sanders" and either a term relating to her son <u>or</u> a term relating to his condition, resulting in 2,657 hits.  (<u>Id.</u>)  Defendants' proposed Search No. 2 uses an "AND" connector, requiring "Sanders" <u>and</u> both a term relating to plaintiff's son and a term relating to his disability, resulting in only 166 hits.  (<u>Id.</u>)

Defendants object to plaintiff's Search No. 2 on the grounds that it uses terms that are common in a hospital setting, such as "emergency," "surgery," and "injection," arguing that "[i]ncluding these terms without appropriate limitation will invariably catch a voluminous number of irrelevant mishits."  (Defs.' Ltr. at 6).  The difference between plaintiff's 2,657 hits and defendants' 166 hits is stark.  Since plaintiff seeks information regarding her status as a caregiver to her disabled son, it is reasonable to require three categories of terms – those referring to plaintiff, her son, and his condition – in order to narrow hits to those related to plaintiff's claims.  Although plaintiff notes that she "is not a nurse and did not have job duties involving patient care concerning picc lines, injections, or catheters" (Pl.'s Ltr. at 8), it seems likely that searches including a wide array of medical terms in relation to only a hospital employee's name might primarily hit on documents not relevant to the case.  The Court finds that these deficiencies can be corrected by retaining the various search terms identified by plaintiff, while using an "AND" connector to require a reference to plaintiff, her son, <u>and</u> the

related medical terms or caregiving duties.  Accordingly, plaintiff's motion to compel Search No.

2 is granted as modified below:

> (sanders) w/20 (son OR child OR Daniel OR relative OR "family member" AND
> (emergency OR lifesaving OR life-saving OR surgery OR "colectomy" OR colon OR
> "feeding tube" OR "digestive tract" OR "Ulcerative Colitis" OR picc OR injection OR
> catheter OR "inflame*" OR disease OR bowel OR distract* OR commit* OR dedicat*
> OR caregiver OR (reduce* w/5 schedule) OR workload)).

### 3.   Search No. 3

Search No. 3 seeks communications relating to plaintiff's request for reasonable

accommodations.  (Pl.'s Ltr. at 8).  For Search No. 3, as with Search No. 2, the primary

distinction between the parties' proposed searches is defendants' use of "AND," which reduces

plaintiff's 844 hits to 197.  (Defs.' Table).  Defendants seek to narrow Search No. 3 to require

plaintiff's name in conjunction with both a term relating to her accommodation requests and a

term relating to her transfer.  (Id.)  It is reasonable, however, to conclude that both information

relating to plaintiff's accommodation requests and her transfer would be relevant to her claim,

without requiring those topics to be mentioned in direct proximity to each other.  Accordingly,

plaintiff's proposed Search No. 3 should be run.

### 4.   Search No. 4

Search No. 4 seeks information regarding whether defendants permitted "other

employees within the Social Work and Care Management groups to work from home."  (Pl.'s

Ltr. at 9; see also Defs.' Table).  Plaintiff argues that plaintiff and defendants' proposed searches

are "virtually identical, except [p]laintiff proposed an extender to 'social work*' which would

likely include 'social worker.'"  (Id.)  Defendants argue that plaintiff's inclusion of "care

management" in her proposal means that her search is "ostensibly" a "departmental search, as

opposed to an individual search," and that the term "social work" is therefore more appropriate

than "social worker."  (Defs.' Opp. at 4).  Defendants further argue that this search is

unnecessary because they have "already identified all employees of the Care Management
department, which includes the social work unit, who have requested or been permitted to work
remotely from 2018 to present" and any "other requests or requests made by employees outside
of the Care Management department are irrelevant."  (Id.)  However, plaintiff notes that she
seeks information not only as to which social workers, if any, were allowed to work remotely,
but also about the process for considering such requests, and whether defendants treated all
requests equally, or if plaintiff was subjected to a different standard.  (Pl.'s Reply[12] at 7–8).  This
information may be relevant to plaintiff's discrimination claims.

The Court notes that using a wildcard[13] modifier ("*") would return documents that
contain the root word "social work," plus documents with terms containing any additional letters,
such as "social worker."  At any rate, defendants' argument is without merit, and it is
undermined by their consent to extensive use of similar modifiers in the agreed-upon searches.
(See ECF No. 41-4).  Furthermore, defendants do not argue that plaintiff's proposed Search No.
4 produces disproportionate amount of hits – and the Court finds that a difference of 393 hits[14]
between the number of hits generated by each search is not significant when considering the
relevance of the information sought.  Regardless of whether plaintiff's search is intended to be a
"departmental search," information regarding defendants' handling of other Care Management
employees' leave requests may be relevant in establishing whether plaintiff's work from home

---

[12] Citations to "Pl.'s Reply" refer to plaintiff's letter replying to defendant's letter in opposition to
plaintiff's letter motion to compel, filed February 26, 2024 (ECF No. 47).

[13] Referred to as an "extender" by plaintiff, supra, a "wildcard[] can help you expand your keywords to
include terms that contain part of a keyword or terms that have alternative spellings."  Searching and using
keywords in the eDiscovery Center, Microsoft SharePoint, (Jan. 25, 2023) (providing the example of "risk*"
generating "risk, risks, risked, risking, and risky"), https://learn.microsoft.com/en-
us/sharepoint/governance/searching-and-using-keywords-in-the-ediscovery-center#using-wildcards.

[14] The Court calculated the difference by subtracting 475 (defendants' search hits) from 868 (plaintiff's
search hits).  (Defs.' Table).

request was subjected to a disparate procedure.  Accordingly, plaintiff's proposed Search No. 4 should be run.

       5.    <u>Searches No. 5 and 6</u>

Search Nos. 5 and 6 seek documents regarding potential exposure to various contagious viruses and diseases, including COVID-19, in plaintiff's workspaces.  (Defs.' Table). Combining the results for Search Nos. 5 and 6, plaintiff's proposed searches result in 4,120 hits, while defendants' proposed searches result in 214 hits.  (<u>Id.</u>)  Defendants' proposed Search No. 5 seeks to require plaintiff's name in connection with these diseases while, at the same time, defendants also removed search terms referring to respiratory diseases other than COVID-19 for both proposed Search Nos. 5 and 6.  (<u>Id.</u>)  Defendants assert that plaintiff's COVID-19 related accommodation request was granted because she received more extensive personal protective equipment than her colleagues, and the unit to which plaintiff was transferred allegedly did not house patients who tested positive for COVID-19.  (Defs.' Pos. Statement[15] at 6, 13-14). Plaintiff seeks to establish that "such contentions [regarding her transfer] were disingenuous" (Pl.'s Ltr. at 9), and that exposure to a variety of contagious viruses and diseases, including COVID-19, put her and her son at risk (<u>See</u> Am. Compl. ¶¶ 2-3, 61, 95-97, 178). Communications regarding the level of exposure to respiratory diseases in the units that plaintiff was assigned to work in, regardless of whether plaintiff is mentioned by name, may therefore be relevant to her claim.  Moreover, plaintiff should be granted broad latitude to search for terms relating to these diseases, rather than defendants' proposed searches, which focus only on whether patients had tested positive  for COVID-19.  Accordingly, plaintiff's proposed Search Nos. 5 and 6 should be run.

---

[15] Citations to "Defs.' Pos. Statement" refer to defendants' Position Statement to the EEOC, filed on February 12, 2024 by plaintiff as Exhibit 3 to her letter motion to compel (ECF No. 42-3).

6.      Search Nos. 7 and 8

Search No. 7 seeks information regarding the handling of plaintiff's work schedule, while Search No. 8 focuses on information pertaining to the handling of other social workers' work schedules.  (Defs.' Table; Pl.'s Ltr. at 10).  Plaintiff's proposed searches result in 1,613 hits relating to Search No. 7 and 1,446 hits relating to Search No. 8.  (Id.)  Defendants' proposed searches exclude the term "schedule" and require the term "arriv*" to appear within ten words of the terms "time" or "late," resulting in 144 and 98 hits, respectively.  (Defs.' Table).  Defendants argue that the term "schedule" is generic and will result in overbroad results that are not proportional to the needs of the case.  (Defs.' Opp. at 4).  Plaintiff's searches, however, do not result in hits that are disproportionate to the needs of the case, given that plaintiff claims her work schedule was subjected to different standards than those of her colleagues, and her searches are limited to hits in conjunction with her name or the names of her colleagues.  Accordingly, plaintiff's proposed Search Nos. 7 and 8 should be run.

7.      Search No. 9

Search No. 9 seeks communications about plaintiff's protected complaints.  (Pl.'s Ltr. at 10).  The parties' proposed searches are identical, save for a disagreement over whether "Sanders" should appear within 35 words or 20 words of terms about her complaints.  (Defs.' Table).  This results in a difference of only 224 hits.  An additional 224 hits should not create an undue burden for defendants, and given the broad nature of discovery, plaintiff's proposed Search No. 9 should be run.

IV.   Specific Document and Interrogatory Requests

In addition to disputing the relevant search terms and custodians for ESI discovery, the parties also have raised disputes regarding the scope of documentary discovery.

15

A. Plaintiff's Requests

1. Comparator Information:

a. Document Request Nos. 13, 105, 108, 110

In Document Request No. 13, plaintiff seeks all documents from January 1, 2018 onward, concerning formal and informal performance reviews of employees who reported to defendant Fraser-McCleary directly or indirectly.  (RFP No. 13 [16]).  Document Request No. 105 seeks documents concerning "performance, hiring, termination, compensation, evaluation, title, reprimand, discipline, or promotion" from the personnel files of all employees who reported to Fraser-McCleary anytime from January 1, 2018 onward.  (RFP No. 105).  Plaintiff also seeks all documents concerning FMLA requests from Transplant, Social Work, and Care Management department employees since 2018 (RFP No. 108), and all documents concerning Transplant department employees working remotely due to the "COVID-19 Omicron outbreak."  (RFP No. 110).

Defendants object to these Document Requests on the grounds that they are "overly broad, unduly burdensome," and call for the production of documents "that are not relevant to the claims" and "not proportional to the needs of this case."  (RFP Nos. 13, 105, 108, 110).

As an initial matter, when a party objects on the grounds of burden, they "must go beyond the familiar litany that requests are burdensome . . . and submit affidavits or other evidence revealing the nature of the burden."  Schiavone v. Northeast Utilities Serv. Co., No. 08 CV 429, 2010 WL 382537, at *1 (D. Conn. Jan. 27, 2010) (internal citations and quotation marks omitted).  Although defendants raise the objection that plaintiff's requests are burdensome with

---

[16] Defendants' responses to plaintiff's specific document requests will be noted by the number of the document request as listed in Defendants' Revised Responses and Objections to Plaintiff's First Set of Document Requests, filed on February 12, 2024 by plaintiff as Exhibit 1 to her letter motion to compel ("Defs.' RFP Resp.") (ECF No. 42-1).

respect to virtually all of the disputed requests, defendants do not explain with any particularity why producing the requested documents poses any meaningful burden.  Thus, defendants' burden objection is without merit.

Plaintiff asserts that these documents are relevant to her discrimination claim insofar as they establish whether she was "treated differently than similarly situated employees outside her protected group."  (Pl.'s Ltr. at 2 (citing Williams v. Mount Sinai Med. Ctr., 859 F. Supp. 2d 625, 640 (S.D.N.Y. 2012))).  Plaintiff also cites several cases to support her argument that personnel files are relevant to identifying potential comparators and establishing disparate treatment.  (See id. at n.9).

Defendants argue that "[a]side from generally stating that information about comparators can be relevant in employment cases, plaintiff fails to explain how or why the specific personnel files of these dozens of employees are remotely relevant to her case, much less proportional to the needs of the case."  (Defs.' Opp. at 5 (citing Babbitt v. Koeppel Nissan, Inc., 2019 WL 3296984, at *2 (holding that plaintiff who requested the complete personnel files of two colleagues "should specify the categories of documents that she seeks from the files and explain their relevance to this case"))).  Defendants further argue that plaintiff "fails to establish that these dozens of employees are similarly situated to her in the first place."  (Defs.' Opp. at 5 (citing Novick v. Village of Wappingers Falls, N.Y., 376 F. Supp. 3d 318, 343-44 (S.D.N.Y. 2019) (internal citations and quotation marks omitted) (holding that "[t]o be 'similarly situated,' the individuals with whom [a plaintiff] attempts to compare [her]self must be similarly situated in all material respects"))).  The case relied on by defendants – Novick v. Village. of Wappingers Falls, N.Y. – involved a motion to dismiss.  376 F. Supp. 3d at 325.  By contrast, the bar for establishing that someone is "similarly situated," and thus, a comparator in the context of a

17

discovery dispute,  is "set relatively low."  Bagley v. Yale Univ., No. 13 CV 1890, 2015 WL 8750901, at *2 (D. Conn. Dec. 14, 2015).  A comparator "must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."  Id. (quoting McGuinness v. Hall, 263 F.3d 49, 54 (2d Cir. 2001)).  While defendants seem to suggest that the 40 employees reporting to Fraser-McCleary, including 30 other social workers "who have various roles across SUNY Downstate" (Defs.' Opp. at 5), are not suitable comparators to the plaintiff, courts have found that "[t]ypically, a key determinant as to the employees who are proper comparators with an employment discrimination plaintiff is whether they shared a common supervisor."  Russo-Lubrano v. Brooklyn Fed. Sav. Bank, No. 06 CV 672, 2007 WL 2126086, at *1 (E.D.N.Y. July 23, 2007) (citing Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)).  Thus, the Court finds that, at this stage of discovery, all employees who report to Fraser-McCleary are appropriate comparators for purposes of obtaining discovery about them.

Despite this finding, the Court also finds that the categories for which plaintiff seeks production of personnel records for 40 employees, including documents related to "performance, hiring, termination, compensation, evaluation, title, reprimand, discipline, or promotion," are overbroad.  Plaintiff claims that her supervisor discriminated against her and retaliated against her for taking protected FMLA leave and for requesting accommodations to care for her son. (See, e.g., Am. Compl. ¶¶ 2, 3, 102).  Plaintiff has not demonstrated why, for example, documents relating to the performance of other employees is relevant, nor has she demonstrated how documents relating to the hiring, compensation, title, or even promotion of these other employees are proportional to the claims in this case.

Accordingly, plaintiff's motion to compel responses to Document Requests No. 13 and No. 105 is denied, but without prejudice to propose more focused categories relevant to the case.

Turning to Document Request No. 108, plaintiff asserts that documents pertaining to the handling of other Social Work, Care Management, or Transplant department employees' FMLA leave requests is relevant to her allegation "that [d]efendants retaliated against her for seeking such leave." (Pl.'s Ltr. at 3). Defendants counter that because plaintiff "alleges that she was treated less well than employees who *did not* take FMLA leave or request accommodations," information regarding other employees' FMLA or accommodation requests is irrelevant. (Defs.' Opp. at 5). Similar to the Court's discussion of ESI Search No. 4, the Court finds that information regarding the treatment of other employees' FMLA leave requests is relevant to plaintiff's claims because it may indicate that plaintiff was subject to a different procedure. Accordingly, the Court grants plaintiff's motion to compel responses to Document Request No. 108.

With respect to Document Request No. 110, plaintiff concedes that no other Transplant Program employees were social workers or reported to Fraser-McCleary, but that they could still be comparators "to see whether [d]efendants permitted other workers within the Transplant Program to work remotely." (Pl.'s Ltr. at 4). Defendants claim that it is "undisputed that [p]laintiff was not subject to the policies and procedures of the Transplant Program." (Defs.' Opp. at 6). The Court also notes defendants' assertion that plaintiff could not work remotely during the COVID-19 pandemic because social workers were deemed essential workers whose jobs had to be performed onsite. (Defs.' Pos. Statement at 5). Plaintiff argues that defendants required her to work in person "even though she was able to perform her job remotely" (Am. Compl. ¶ 77), and she alleges that because she was a social worker assigned to the Transplant

Program, she was required to report to, and was subject to the policies of, both the Care

Management department, which oversees all social workers, and the Surgery department, which

oversees the Transplant Program.  (ECF No. 47-1 ¶¶ 6-7).  Given that plaintiff was a social

worker assigned to the Transplant Program, the Court finds that these employees may be

similarly situated in terms of the conditions under which they were required to work, and

therefore, they may be suitable comparators.  Accordingly, defendants are also directed to

respond to Document Request No. 110.

b.  <u>Interrogatory Nos. 16, 18, 19, 23</u>

Plaintiff's Interrogatory No. 16 seeks the identities of "all employees of the Social Work

and Care Management department who have taken or requested FMLA leave from 2018 to the

present." (Interrog. No. 16[17]).  Interrogatory No. 18 seeks the identities of all employees of the

"Social Work and Care Management departments who have requested or been granted a

reasonable accommodation" since 2018.  (Interrog. No. 18).  In her modified Interrogatory No.

19, plaintiff seeks the identities of "all employees of the Social Work and Care Management

Departments with caregiver responsibilities who requested accommodations or modifications in

connection with their caregiver status."  (ECF No. 42-4).

While "[w]hether or not a plaintiff reports to the same supervisor as her comparator is an

important factor in finding that plaintiff and the comparator are similarly situated," <u>Akinyemi v.

Chertoff</u>, No. 07 CV. 4048, 2008 WL 1849002, at *5 (S.D.N.Y. Apr. 25, 2008) (citations

omitted), an employee can also establish that she is similarly situated to a colleague if they are

(1) "subject to the same performance evaluation and discipline standards," and (2) "engaged in

---

[17] Defendants' responses to plaintiff's specific interrogatories will be noted by the number of the
interrogatory, as listed in Defendants' Revised Responses and Objections to Plaintiff's First Set of Interrogatories,
filed on February 12, 2024 by plaintiff as Exhibit 2 to her letter motion to compel ("Defs.' Int. Resp.") (ECF No. 42-
2).

20

comparable conduct." Sasikumar v. Brooklyn Hosp. Ctr., No. 09 CV 5632, 2011 WL 1642585, at *2 (quoting Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000)). To identify suitable comparators, plaintiff must identify colleagues who engaged in comparable conduct, which, in this instance, includes taking FMLA leave, requesting accommodations, and acting as a caregiver to a disabled family member. These are fairly discrete categories, and thus, the Court grants plaintiff's motion to compel responses to Interrogatory Nos. 16, 18, and 19.

In Interrogatory No. 23, plaintiff seeks the identities of all persons who have made complaints against Downstate for violations of the ADA, FMLA, NYSHRL, and NYCHRL, on the grounds of disability or caregiver discrimination, retaliation, or for exercising their FMLA rights. (Interrog. No. 23). In their response, defendants aver that, besides plaintiff, no employee in the Care Management department has made a relevant complaint. (Id.) In her letter motion, plaintiff reiterates her request for the identities of other social workers who have made complaints. (Pl.'s Ltr. at 4). In their response, defendants note that, as the Care Management department encompasses the Social Work department, they have already provided the information plaintiff seeks. (Defs.' Opp. at 5). Accordingly, defendants should update their response to Interrogatory No. 23 to clarify that their answer includes all social workers.

>    2.    Staffing Changes: Document Request Nos. 28, 29, 36; Modified
>           Document Request Nos. 33, 34

In  Document Request No. 28, plaintiff seeks all documents concerning Downstate's "efforts to reduce the length of hospital stays within the Transplant Program" since 2019. (RFP No. 28). Document Request No. 29 seeks "documents reflecting the issues and recommendations from the Center for Medicaid Services," which prompted the restructuring of the Social Work department. (RFP No. 29). Plaintiff asserts that she was transferred in deliberate retaliation for her accommodation requests and protected FMLA leave (Am. Compl. ¶

102), while defendants counter that her transfer was part of a broader restructuring of the Social Work department (See Defs.' Pos. Statement at 3-4, 6-7).  In their EEOC Position Statement, defendants assert that the Social Work department was restructured "in response to a number of issues and recommendations from the Center for Medicaid Services," which included seeking "shorter wait times for patients and their families to speak with social workers to work out their discharge plans."  (Id. at 3).

Documents about the restructuring of the Social Work department may be relevant to establishing whether defendants' claim is pretextual.  Accordingly, plaintiff's motion to compel responses to Document Request No. 29 is granted.

Document Request No. 28, however, seeks documents concerning efforts to reduce the total length of hospital stays in the Transplant Program.  This request is overly broad, because only information regarding efforts to reduce the time patients waited to speak with social workers appears to be relevant to plaintiff's claims.  (See id.)  Accordingly, in response to Document Request No. 28, defendants are directed to provide documents concerning efforts to reduce the time patients had to wait to speak with social workers about their discharge plans.

In her Modified Document Request Nos. 33 and 34, plaintiff seeks documents concerning changes made to social worker staffing when the Transplant Program was suspended and reopened, respectively, including the number of social workers and their specific duties and responsibilities.  (See ECF No. 42-4).  In their EEOC Position Statement, defendants say that plaintiff was not transferred earlier, during restructuring, because the Transplant Program was not operational during January or February of 2020.  (Defs.' Pos. Statement at 4).  The Court finds that documents addressing whether other social workers were transferred, and the time of their transfer, could lead to evidence that defendants' explanation for plaintiff's transfer was

pretextual.  Accordingly, plaintiff's motion to compel responses to Document Request Nos. 33 and 34 is granted.

Document Request No. 36 seeks documents concerning plaintiff's duties during the period when the Transplant Program was shuttered.  (RFP No. 36).  Plaintiff asserts that defendants "made clear that they did not intend to transfer [p]laintiff at all," and documents about plaintiff's work during the shuttering "may show that the 'operational' justifications for [p]laintiff's transfer are pretextual."  (Pl.'s Ltr. at 5).  While defendants object on relevance, proportionality, and confidentiality grounds, defendants have already agreed to produce responsive documents without waiving those objections.  (See RFP No. 36).  Accordingly, defendants are instructed to produce all relevant, non-privileged documents that respond to Document Request No. 36.

   3.   Performance Reviews & Other Complaints:  Document Request Nos. 87, 104; Interrogatory No. 24

In Document Request No. 87, plaintiff seeks documents concerning her performance on daily rounds.  (See RFP No. 87).  Defendants do not object to this request on grounds of relevance, but instead assert that such information is already covered under the parties' agreed-upon ESI Searches No. 1[18] and No. 2.  (See Defs.' Opp. at 6 (citing ECF No. 41-4)).  Agreeing to ESI searches is not the same, however, as agreeing to produce responsive documents, and it does not resolve a party's "independent obligation under the Federal Rules to produce electronic (or paper) documents that are reasonably accessible, relevant, and responsive within the meaning of Rule 34."  Raine Grp. LLC v. Reign Cap., LLC, 2022 WL 538336, at *1.  Accordingly, plaintiff's motion to compel responses to Document Request No. 87 is granted.

---

[18] Not to be confused with disputed ESI Search No. 1, which was denied by the Court above, supra at 10-11, the parties previously agreed to eleven ESI searches, including agreed-upon ESI Search No. 1:  (sanders) w/15 (dut* OR responsib* OR "job description" OR "job function").  (ECF No. 41-4).

Document Request No. 104 seeks all evaluations of defendant Fraser-McCleary's performance since 2018.  (See RFP No. 104).  Defendants argue that a request for Fraser-McCleary's performance evaluations is irrelevant to plaintiff's "allegations about an isolated claim of discrimination and retaliation."  (Defs.' Opp. at 6).  Plaintiff argues that courts have "repeatedly held" that a plaintiff is "entitled to his or her supervisor's entire personnel file especially where, as here, their supervisor is purportedly responsible for the unlawful conduct." (Pl.'s Reply at 5-6 (citing Pl.'s Ltr. at 5-6, n.14 (citing cases))).  Since she only requests 5 years of performance evaluations, which are "performed on an annual basis" (Pl.'s Ltr. at 5), plaintiff asserts defendants must produce the documents.  (Id.).

In refusing to produce Fraser-McCleary's performance evaluations, defendants rely on the decision in Max Torgovnick v. SoulCycle, Inc., No. 17 CV 1782, 2018 WL 5318277, at *4 (S.D.N.Y. Oct. 29, 2018), but defendants' summary of the court's holding in that case – "documents of a supervisor's performance [were] irrelevant to single-plaintiff employment discrimination case" –  is misleading.  (Defs.' Opp. at 6).  In fact, the court in Max Torgovnick v. SoulCycle, Inc. denied plaintiff's request for performance evaluations of supervisors with whom he had never had any interactions but granted the request for performance reviews relating to the supervisors named in the complaint.  2018 WL 5318277, at *4 (ordering defendants to produce the personnel files of named supervisors and any complaints lodged against them).

In this case, Fraser-McCleary is not only named in the Complaint, but she is alleged to be directly responsible for certain alleged discriminatory conduct.  (See Am. Compl. ¶¶ 81, 83-87, 101, 162-163).  Given that Fraser-McCleary is "alleged to have engaged in the discrimination or retaliation at issue, or played a significant role in the decision or incident that [gave] rise to the lawsuit," discovery of her performance evaluations is appropriate.  See Dzanis v. JPMorgan

Chase & Co., No. 10 CV 3384, 2011 WL 5979650, at *4 (S.D.N.Y. Nov. 30, 2011).

Accordingly, plaintiff's motion to compel responses to Document Request No. 104 is granted.

Interrogatory No. 24 seeks the identities of all persons who have made a complaint against defendant Fraser-McCleary.  (Interrog. No. 24).  Defendants aver that, besides plaintiff, no other employee has filed an ODI complaint against Fraser-McCleary.  (Id.)  (See also Defs.' Opp. at 6, n.5 (indicating that the Office of Diversity and Inclusion, now known as the Office for Institutional Equity, "handles complaints of discrimination and retaliation" at Downstate)). Defendants further contend that ODI complaints are the "only types of complaints that could possibly have relevance" to this case.  (Defs.' Opp. at 6).  Plaintiff counters that she is "aware that other employees had complained about Fraser-McCleary," and she asserts that defendants' response is "insufficient as individuals may have made complaints to other offices or directly to their supervisors," providing her own process of complaining about discrimination and retaliation to various offices and individuals other than ODI as an example of this possibility. (Pl.'s Reply at 6).  Thus, plaintiff argues she is entitled all complaints filed against Fraser-McCleary, not only those complaints filed with ODI.  (Id.)

The Court finds that it is reasonable to conclude that other formal or informal complaints of discrimination, failure to accommodate, or retaliation could have been lodged against Fraser-McCleary, either internally to individuals or offices other than ODI, or externally.  Plaintiff is entitled to discovery of that information.  See, e.g., Max Torgovnick v. SoulCycle, Inc., 2018 WL 5318277, at *4 (holding that "[p]laintiff is entitled to discover any claims of disability discrimination, harassment, or retaliation that have been lodged against the managers and supervisors with whom Plaintiff interacted, if such documents exist"); Dzanis v. JPMorgan Chase & Co., 2011 WL 5979650, at *4 (ordering defendants to produce the personnel record of a

25

named defendant alleged to have "'supervisory authority'" over plaintiff and alleged to have "participated in the discriminatory conduct at issue" because complaints of "discrimination or retaliation, or disciplinary actions" would be "directly relevant" to the plaintiff's claims). Accordingly, defendants are directed to answer Interrogatory No. 24 to the extent they are aware of any other complaints against Fraser-McCleary beyond those reported to ODI.

### 4.   Knowledge of Plaintiff's Protected Status

In Modified Interrogatory Nos. 3 and 7, plaintiff seeks the identities of all individuals working in HR, the ADA office, hospital leadership, and/or as supervisors in the Social Work department who were aware of plaintiff's son's medical conditions from March 2020 onward and/or those who were aware of plaintiff's medical conditions from July 2020 onward, for which she requested reasonable accommodations.  (ECF No. 42–4).  She also seeks to know when each individual became aware of her or her son's conditions.  (Id.)  Plaintiff alleges that the identities of the individuals who knew about her conditions and her son's conditions, and the dates they became aware, are relevant to her claims because she must establish that defendants were aware of her disability, or her son's, to establish a prima facie claim under the ADA.  (Pl.'s Ltr. at ns. 17, 18 (citing cases)).  While defendants assert that "there is simply no way to determine, with any degree of certainty, which of the dozens of SUNY Downstate employees implicated by these interrogatories may have at some point 'been aware' of Plaintiff's and/or her son's medical conditions"  (Defs.' Opp. at 7), plaintiff counters that "[she] has alleged that multiple individuals participated in the discrimination and retaliation" and she "needs responses to [Interrogatory Nos.] 3 and 7 to identify who she should be deposing" (Pl.'s Reply at 6).

The Court finds it reasonable that other Downstate employees aside from those specifically named in plaintiff's Complaint may have been involved in making the allegedly

discriminatory and retaliatory decisions to transfer plaintiff and deny her accommodation requests, among other alleged conduct.

Accordingly, to the extent that defendants know of any additional individuals who became aware of plaintiff's son's conditions from March 2020 onward, or plaintiff's conditions from July 2020 onward, defendants are Ordered to respond to Modified Interrogatories No. 3 and No. 7 by identifying those individuals and by indicating when those individuals became aware.

B.    Defendants' Requests

Defendants also raise certain issues related to plaintiff's responses to defendants' requests.

1.    Plaintiff's Prior Complaints:  Interrogatory No. 22

In Interrogatory No. 22, defendants seek information regarding any complaints of discrimination or retaliation that plaintiff made between January 1, 2015 to the present, including the nature of the complaint, the person or entity against whom the complaint was made, and any response to the complaint.  (See Pl.'s Interrog. No. 22[19]).  Plaintiff objects to Interrogatory No. 22 on the grounds that it seeks information that is not relevant to the case because it "could include matters outside of the employment context, other employers beyond the defendants, and complaints otherwise unrelated to . . . this matter."  (Id.)  Thus, she has answered Interrogatory No. 22 only in the context of her employment at Downstate.  (Id.)  Plaintiff, however, has been employed[20] by Downstate since 2009 (Am. Compl. ¶ 23), and she certifies that "she never complained of discrimination and/or retaliation in the employment context prior to the

---

[19] Plaintiff's responses to defendants' specific interrogatories will be noted by the number of the interrogatory as listed in Plaintiff's Responses to Defendants' First Set of Interrogatories, filed on February 12, 2024 as an attachment to defendants' letter motion to compel ("Pl.'s Int. Resp.") (ECF No. 41-2).

[20] In her letter motion to compel, plaintiff noted that she had recently notified defendants that she will be leaving her job.  (Pl.'s Ltr. at n.2).  She also indicated her intent to seek leave to amend her Complaint to add a claim of constructive discharge, and that defendants would not "consent to the amendment without explanation."  (Id.)

complaints which are part of this litigation" (Pl.'s Opp. at 2).  (See also id. at n.4 (describing plaintiff's limited involvement as a witness in an investigation Downstate conducted regarding a doctor's use of derogatory language)).  Accordingly, plaintiff should update her response to Interrogatory No. 22 to include that certification.

       2.  Plaintiff's Healthcare Records

Defendants request that plaintiff disclose her complete healthcare records.  (Defs.' Ltr. at 3).  After meeting and conferring with defendants in May of 2023, plaintiff provided HIPAA-compliant authorizations from January 1, 2017 to the present.  (Id.)  Defendants now ask for records dating back to the beginning of plaintiff's employment at Downstate in 2009.  (Id.)[21]

Plaintiff objects to producing her complete healthcare records predating January 1, 2017, a date which she claims the parties previously agreed to and which is already "more than three years before any alleged misconduct that serves as the basis" for her case.  (Pl.'s Ltr. at 2).  While plaintiff concedes that she has "put at issue her mental health in this lawsuit" (id.), she argues that releasing her medical records from 2009 to 2017 would result in the disclosure of all her medical information for more than additional eight years prior to any conduct that serves as a basis for the litigation.  (See id.)  Plaintiff notes that in arguing their entitlement to medical records from the beginning of plaintiff's employment at Downstate (Defs.' Ltr. at 3), virtually all of defendants' case authority comes from cases involving recent hires.  (Pl.'s Opp. at 3 (citing McIntosh v. Bank of Am., No. 06 CV 708S, 2008 WL 4501911, at *4, n.2 (W.D.N.Y. Sept. 30, 2008) (holding that "[t]he Court chooses [starting year] to afford defendant the opportunity to

---

[21] As an initial matter, defendants have failed to attach the applicable document requests, and therefore are not in compliance with Local Civil Rule 37.1 (providing that "the moving party shall specify and quote or set forth verbatim in the motion papers each discovery request and response to which the motion or application is addressed").  Notwithstanding this procedural deficiency, in order to "save time and resources in accordance with Rule 1 of the Federal Rule of Civil Procedure, the Court has analyzed the motion on the merits."  In re AutoHop Litig., No. 12 CV 4155, 2014 WL 5591047, at *4 (S.D.N.Y. Nov. 4, 2014).

review medical records two years prior to plaintiff's commencement of employment with defendant and three years prior to the alleged onset of discrimination"); Bujnicki v. American Paving & Excavating, Inc., 99 CV 646S, 2004 WL 1071736, at *19 (W.D.N.Y. Feb. 25, 2004) (ordering plaintiff to produce records "within the two years preceding plaintiff's employment with defendants," where plaintiff's employment lasted only six weeks)).

Rule 26(c) authorizes the Court to engage in a balancing analysis by allowing as much relevant discovery as possible while, at the same time, "preventing unnecessary intrusions into the legitimate interests – including privacy and other confidentiality interests – that might be harmed by the release of the material sought." E.E.O.C. v. Nichols Gas & Oil, Inc., 256 F.R.D. 114, 122 (W.D.N.Y. 2009). Although plaintiff's recent medical records regarding her mental health during or near the time of the events at issue are clearly relevant to her claim, her entire medical history going back to 2009 is only marginally relevant and implicates privacy and confidentiality concerns. Defendants claim that "the few relevant healthcare records plaintiff has been willing to release indicate that she has been in treatment and has been on medication well before" July 2020, when she alleged her symptoms began (Defs.' Ltr. at 3), but defendants provide no such documentation for such an assertion. The Court grants defendants' request for records going back to 2014 and if they demonstrate that plaintiff was being treated for mental health issues prior to that time, defendants may renew their request for additional records.

CONCLUSION

For the reasons set forth above, Downstate CEO Dr. David Berger must be included as an ESI custodian for the limited searches proposed by plaintiff. Regarding the disputed ESI Searches, plaintiff's motion to compel Search No. 1 is denied; plaintiff's Search No. 2 is granted as modified; and plaintiff's Search Nos. 3–9 are granted as is.

29

Regarding plaintiff's motion to compel responses to Document Requests, the Court grants plaintiff's motion to compel responses to Document Request Nos. 29, 33, 34, 87, 104, 108, and 110, and further Orders defendants to respond to plaintiff's Document Request Nos. 28 and 36 as modified herein.  Plaintiff's motion to compel responses to Document Request Nos. 13 and 105 is denied.

Regarding plaintiff's motion to compel responses to Interrogatories, the Court grants plaintiff's motion to compel responses to Interrogatory Nos. 16, 18, and 19, and further Orders defendants to respond to plaintiff's Interrogatory Nos. 3, 7, and 24 as modified herein. Defendants are also Ordered to update their response to plaintiff's Interrogatory No. 23.

Defendants' unnumbered request for more extensive HIPAA authorizations is granted, but only back to January 1, 2014.  Plaintiff is also Ordered to update her response to defendants' Interrogatory No. 22.

All responses to discovery requests Ordered herein must be exchanged by **October 28, 2024**.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      September 16, 2024

                                  *Cheryl L. Pollak*
                             Cheryl L. Pollak
                             United States Magistrate Judge
                             Eastern District of New York