UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
SUSAN SANDERS,

                          Plaintiff,

            -against-                              **MEMORANDUM AND ORDER**
                                                  22 CV 4139 (KAM) (CLP)
SUNY DOWNSTATE MEDICAL CENTER
and SUSAN FRASER-MCCLEARY,

                          Defendants.
----------------------------------------------------------X
**POLLAK**, United States Magistrate Judge:

On July 14, 2022, plaintiff Susan Sanders ("plaintiff") commenced this action against

defendants SUNY Downstate Medical Center ("Downstate") and Susan Fraser-McCleary

("Fraser-McCleary") (collectively, "defendants"), alleging claims of workplace discrimination,

failure to accommodate, and retaliation in violation of the Family and Medical Leave Act, 29

U.S.C. §§ 2601 et seq. ("FMLA"), the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq.

("Rehab Act"), the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), the

New York State Human Rights Law, N.Y. Exec. L. §§ 296 et seq. ("NYSHRL"), and the

Administrative Code of the City of New York, §§ 8-107 et seq. ("NYCHRL").  (ECF No. 1 ¶¶ 1-

8, 181-256).  Defendants answered the original Complaint on May 19, 2023.  (ECF No. 25).  On

June 9, 2023, plaintiff filed her First Amended Complaint (FAC[1]), which defendants answered

on December 13, 2023 (ECF No. 37).

Currently pending before this Court is plaintiff's motion for leave to file a Second

Amended Complaint.  (ECF No. 49).  For the reasons set forth below, the Court grants plaintiff's

motion to amend.

---

[1] Citations to "FAC" refer to plaintiff's First Amended Complaint, filed on June 9, 2023 (ECF No. 27).

## FACTUAL BACKGROUND

Defendant Downstate is a non-profit educational institution located in Brooklyn, New York, comprised of a medical school, two colleges, two graduate schools, research centers, and a teaching hospital with outpatient clinics and community health centers.  (FAC ¶¶ 16, 17).  Plaintiff began her employment at Downstate's University Hospital of Brooklyn ("Hospital") in 2009 as an outpatient social worker in the Transplant Program.  (Id. ¶¶ 1, 23).  Plaintiff is also the primary caregiver to her son, who lives with Ulcerative Colitis, an inflammatory bowel disease.  (Id. ¶ 43).  Plaintiff's son has undergone extensive treatment for his condition, requiring her to take leave under the FMLA to care for him.  (Id. ¶¶ 43, 47).  Plaintiff took protected FMLA leave for a week in January 2020 (id. ¶¶ 49, 51), for a month between July and August 2020, after her son developed a sudden complication that required emergency life-saving surgery (id. ¶¶ 52, 53), and for over a week in both January and May 2021.  (Id. ¶ 60).

In addition to taking FMLA leave, plaintiff submitted requests to work from home in order to care for her son and mitigate his exposure to the COVID-19 virus.  (Id. ¶¶ 61-69).  On March 30, 2020, plaintiff submitted a request to work from home to Downstate's ADA office, including a note from her son's doctor.  (Id. ¶ 63).  Nicole Sharpe, ADA Ethics Analyst and Associate to the Assistant Vice President, and Anthony Parker, Assistant Vice President of Human Resources, both referred plaintiff to her immediate supervisor for permission to work from home.  (Id. ¶¶ 64-66).  Sharpe told plaintiff that with her supervisor's permission, it "should be possible" to grant her request to work from home.  (Id. ¶ 65).  When plaintiff sent her request to Social Work Supervisor Heather Frier, Frier said she did not have the authority to grant such a request, and plaintiff then forwarded her request to Frier's supervisor, Assistant Vice President for Care Coordination Susan Fraser-McCleary, on April 1, 2020.  (Id. ¶¶ 67, 68).  When defendant Fraser-McCleary failed to respond, plaintiff notified Parker, who likewise failed to

2

answer. (Id. ¶ 69). Shortly thereafter, while the request was pending, plaintiff was diagnosed with COVID-19 on April 13, 2020. (Id. ¶ 71). Plaintiff was approved for a medical leave of absence for three weeks, during which time her son had to live elsewhere to avoid COVID-19 exposure; plaintiff then returned to in-person work in May 2020 after Downstate failed to grant her accommodation request. (Id. ¶¶ 71-73, 78).

Plaintiff took approximately a month of FMLA leave starting on or around July 9, 2020, when her son was admitted to the hospital for an emergency life-saving surgery. (Id. ¶ 80). When plaintiff returned from FMLA leave on or around August 18, 2020, she was informed by Social Work Supervisor Heather Frier that she had been reassigned to the Hospital's inpatient unit, effective September 21, 2020, which was later confirmed by a letter from defendant Fraser-McCleary that plaintiff received on or around August 25, 2020. (Id. ¶¶ 83-86). Plaintiff alleges that the transfer was retribution for the protected FMLA leave she had taken from work, and that the transfer increased her and her son's risk of exposure to the COVID-19 virus and other contagious diseases. (Id. ¶¶ 2, 88, 102). Plaintiff supports this retaliation claim by alleging that the transfer did not serve patient interests, since plaintiff had minimal inpatient experience, and by asserting that Frier told a colleague that defendant Fraser-McCleary was intent on transferring plaintiff to inpatient services. (Id. ¶¶ 88, 101). Plaintiff also asserts that defendants actually filled the outpatient role from which she had been transferred with a social worker who possessed extensive inpatient experience, had been hired to specifically serve inpatient populations, and did not want or request the transfer. (Id. ¶ 89). Defendants deny these allegations, admitting only that part of its 2020 restructuring included transitioning from a "team-

based model to a unit-based model, which required the social work department to transfer several of its social workers." (Defs.' Am. Answer[2] ¶ 39).

In July 2020, plaintiff alleges that she began suffering from severe anxiety and panic attacks, and she was subsequently diagnosed with Post-Traumatic Stress Disorder. (See FAC ¶¶ 115, 116-117). Plaintiff alleges that her symptoms were heightened after her transfer to the inpatient position, particularly when she had to enter patient rooms. (Id. ¶¶ 118, 119). Shortly before and immediately following her transfer, plaintiff made requests for accommodations, lodged formal complaints, and met with senior Hospital administrators regarding her transfer. (See id. ¶¶ 101-105, 122-124, 132, 133, 145-151, 152-157).

Specifically, on September 3, 2020, plaintiff met with Personnel Associate Stephanie Bernadel of the Office of Employer Labor Relations ("OELR") regarding her transfer. (Id. ¶ 103). Plaintiff alleges that Bernadel, who was aware of her son's disability, agreed that she could not work on an inpatient floor. (Id. ¶ 104). In addition to her own complaints, plaintiff alleges that, on September 11, 2020, she learned during a conversation with Frier that one of her coworkers had protested to Frier about plaintiff's transfer, and that Frier had responded by saying defendant Fraser-McCleary was doing "everything she could" to place plaintiff in an inpatient role. (Id. ¶ 101). On September 18, 2020, OELR upheld plaintiff's transfer. (Id. ¶ 105). On October 7, 2020, plaintiff submitted a request to Downstate's ADA office, seeking an accommodation related to her anxiety and panic attacks, which was denied on November 18, 2020. (Id. ¶¶ 122, 132, 133).

Separately, in early October 2020, plaintiff alleges that Frier began permitting plaintiff to arrive at work 15 minutes late so that she could administer her son's medication in the morning.

---

[2] Citations to "Defs.' Am. Answer" refer to defendants' Amended Answer to plaintiff's First Amended Complaint, filed on December 13, 2023 (ECF No. 37).

(Id. ¶ 161).  Later that month, after plaintiff had requested an accommodation from the ADA office, defendant Fraser-McCleary revoked the courtesy Frier had extended to plaintiff, directing plaintiff to arrive at work by 9:00 a.m. or use FMLA leave.  (Id. ¶¶ 162, 163).

Plaintiff then took her complaints to the Hospital's Chief Executive Officer, Dr. David Berger ("Dr. Berger"), on November 23, 2020.  (Id. ¶ 152).  On November 24, 2020, she filed a complaint with Downstate's Office of Diversity and Inclusion ("ODI"), which was rejected on December 2, 2020.  (Id. ¶¶ 145, 148).  As directed by Dr. Berger, plaintiff met with the Hospital's Chief Operations Officer, Patricia Winston, on December 7, 2020.  (Id. ¶¶ 152–157).  On December 10, 2020, plaintiff asked the ADA office to reconsider its decision denying her accommodation request, but she never received a formal response to this request.  (Id. ¶¶ 140, 142).  That same day, plaintiff also asked the ODI to reconsider its decision as to her complaint, but the ODI upheld its decision on February 11, 2021.  (Id. ¶¶ 149, 151).  On September 13, 2021, plaintiff filed a complaint against defendant Downstate with the United States Equal Opportunity Employment Commission.  (Id. ¶ 11).

In her First Amended Complaint, plaintiff alleges thirteen (13) causes of action: retaliation in violation of the FMLA, the Rehab Act, the ADA, the NYSHRL, and the NYCHRL (Counts I, III, VI, X, and XIII); discrimination in violation of the Rehab Act, the ADA, the NYSHRL, and the NYCHRL (Counts II, V, VIII, and XI); and failure to accommodate in violation of the Rehab Act, the NYSHRL, and the NYCHRL (Counts IV, VII, IX, and XII).

<u>MOTION TO AMEND</u>

On March 19, 2024, plaintiff filed a motion to further amend her First Amended Complaint, proposing two amendments:  (1) to add additional allegations of continuing

workplace harassment; and (2) to add allegations that she was constructively discharged. (Proposed SAC[3] ¶¶ 187-190, 191-199; Pl.'s Mot.[4] at 2-3).

First, plaintiff alleges another incident of ongoing discrimination and harassment that took place in November of 2023. (Proposed SAC ¶¶ 187, 188). During the incident in question, plaintiff decided not to approve a patient for discharge until the patient's home health aide started work the following day. (Id. ¶ 188). Plaintiff contends that defendant Fraser-McCleary repeatedly called her to ask about the patient's discharge arrangements. (Id. ¶ 189). Defendant Fraser-McCleary later summoned plaintiff to a meeting and reprimanded her for "being disrespectful and unprofessional." (Id. ¶ 190).

Second, plaintiff seeks to add facts alleging she was constructively discharged, asserting that, despite her best efforts to improve her working conditions, the cumulative load of harassment and discrimination forced her to leave her job. (Id. ¶¶ 191–197). Plaintiff alleges that, after her son turned 26, her concerns about retaining health benefits for her son were no longer a factor keeping her in the position, and thus she resigned, effective February 29, 2024. (Id. ¶¶ 198, 199).

On April 16, 2024, defendants filed a response in opposition to plaintiff's Motion to Amend. (Defs.' Opp.[5]) Defendants argue that plaintiff's motion should be denied as futile, as her constructive discharge claim fails as a matter of law. (Id. at 1). Defendants assert that because plaintiff remained on the job for over three and a half years after her reassignment, she cannot make the showing of an intolerable work environment necessary for a constructive

---

[3] Citations to "Proposed SAC" refer to plaintiff's Proposed Second Amended Complaint, filed on March 19, 2024 (ECF No. 50-2).
[4] Citations to "Pl.'s Mot." refer to plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Leave to Amend, filed on March 19, 2024 (ECF No. 49).
[5] Citations to "Defs.' Opp." refer to defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Amend Her Complaint, filed on April 16, 2024 (ECF No. 52).

discharge claim.  (Id. at 5 (citing Garrett v. Mazza, No. 97 CV 9148, 2005 WL 2094955, at *5 (S.D.N.Y. Aug. 30, 2005) (finding that "most courts have disfavored constructive discharge claims where plaintiffs have remained on the job for more than a brief time");  Murdaugh v. City of New York, No. 10 CV 7218, 2011 WL 798844 at *6 (S.D.N.Y. Mar. 8, 2011) (holding that "[a]bsent deliberate employer action, a significant passage of time where the employee endured the conditions complained of is sufficient to undermine a claim that working conditions were intolerable"))).

In her reply, plaintiff contends that her continued employment does not preclude her from alleging that she was constructively discharged.  (Pl.'s Reply[6] at 8).  She points to the cumulative effect of years of harassment and retaliation, which other courts have weighed when considering constructive discharge claims.  (Id. at 1 (citing Dobney v. Walt Disney Co., No. 23 CV 5380, 2024 WL 325336, at *5 (S.D.N.Y. Jan. 29, 2024) (holding that "[i]n analyzing a claim of constructive discharge, the effect of a number of adverse conditions in the workplace is cumulative" (internal citations and quotation marks omitted)))).  Furthermore, plaintiff argues that her decision to remain in a position for several years does not make the position objectively tolerable.  (Id. at 1 (citing Green v. Brennan, 578 U.S. 547, 557-58 (2016) (finding that "an employee who suffered discrimination severe enough that a reasonable person in [her] shoes would resign might nevertheless force [her]self to tolerate that discrimination for a period of time"))).

Plaintiff contends that she had no choice but to endure otherwise intolerable conditions to retain health insurance for her chronically ill son, and that she only resigned after he turned 26 years old and was no longer eligible for health benefits coverage.  (Id. at 7).  Finally, plaintiff

---

[6] Citations to "Pl.'s Reply" refer to plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Leave to Amend, filed on May 3, 2024 (ECF No. 53).

asserts that "constructive discharge analysis is a fact intensive inquiry more appropriately addressed at the summary judgment stage" (id. at 7), arguing that her proposed amendment meets the "low bar for pleadings at the motion to dismiss stage."  (Id. at 2 (quoting Belabbas v. Inova Software Inc., No. 16 CV 7379, 2017 WL 3669512, at *7 (S.D.N.Y Aug. 24, 2017)).

DISCUSSION

I.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 15(a)(1), a party may amend "its complaint once as a matter of course within 21 days after serving the [original] complaint or within 21 days after a responsive pleading has been served."  Santagata v. Diaz, No. 17 CV 3053, 2019 WL 2164082, at *2 (E.D.N.Y. May 17, 2019); Blanchard v. Doe, No. 17 CV 6893, 2019 WL 2211079, at *3 (E.D.N.Y. May 22, 2019).  After that, amendments are allowed "only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Rule 15 expresses a strong presumption in favor of allowing amendment, stating that "[t]he court should freely give leave when justice so requires."  Id.  While courts have broad discretion in deciding whether to grant motions to amend, the Second Circuit has cautioned that an amendment should be denied only "'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'"  Bensch v. Estate of Umar, 2 F.4th 70, 81 (2d Cir. 2021) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007)).

II.    Analysis

A.    Undue Delay, Bad Faith, or Undue Prejudice

Defendants oppose the motion to amend by arguing that because plaintiff's constructive discharge claim fails as a matter of law, the proposed amendment must be dismissed as futile. (See Defs.' Opp. at 3).  Although defendants do not raise undue delay, bad faith, or undue prejudice, the Court briefly considers these issues.

8

The new allegations in plaintiff's Proposed Second Amended Complaint include an additional incident of alleged harassment, which began on November 17, 2023, and allegations that she was constructively discharged, premised on plaintiff's resignation, of which she first informed her supervisor on December 11, 2023.  Since both events postdate plaintiff's First Amended Complaint, which was filed on June 9, 2023, and the motion to amend was brought within four months of the additional incident of harassment and within three months of plaintiff's resignation, this Court sees no reason to believe plaintiff acted with undue delay.  See, e.g., Harleysville Worcester Ins. Co. v. Consigli & Assocs., LLC, No. 21 CV 934, 2023 WL 4684652, at *5 (S.D.N.Y. July 21, 2023) (holding that the "motion [was] not unduly delayed, as its proposed amendments stem from events taking place after the filing of the [first amended complaint]"); Richardson Greenshields Securities, Inc. v. Lau, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (collecting cases where leave to amend was granted after delays ranging from two to five years).  The Court also finds no indication of bad faith on the part of the plaintiff.  See, e.g., Randolph Foundation v. Duncan, No. 00 CV 1172, 2002 WL 32862, at *3 (S.D.N.Y. Jan. 11, 2002) (holding that "the fact that a party may have had evidence to support a proposed amendment earlier in the litigation does not, by itself, give rise to an inference of bad faith") (internal citation omitted).

In assessing undue prejudice, "courts consider whether the amendment would: (1) require the opponent to 'expend significant additional resources to conduct discovery and prepare for trial,' (2) significantly prolong the resolution of the action, or (3) 'prevent the plaintiff from bringing a timely action in another jurisdiction.'"  Cummings-Fowler v. Suffolk Cnty. Cmty. Coll., 282 F.R.D. 292, 297 (E.D.N.Y. 2012) (quoting Monahan v. New York City Dep't. of Corr., 214 F.3d 275 (2d Cir. 2000)).  Here, this case remains in document discovery, and the

additional allegations are closely related to the operative Complaint.  Defendants do not assert

that the new allegations in the Proposed Second Amended Complaint would place an undue

discovery burden on them, nor would the additional allegations significantly prolong the

resolution of the action.  Accordingly, the Court does not see any reason to deny plaintiff's

motion based on undue prejudice.  See, e.g., Agerbrink v. Model Serv. LLC, 155 F. Supp. 3d

448, 454 (S.D.N.Y. 2016) (stating that "[t]he non-moving party bears the burden of

demonstrating that substantial prejudice would result if the proposed amendment were granted")

(internal citations and quotation marks omitted).

      B.     <u>Futility</u>

          1.  <u>Standard</u>

Defendants object to the motion for leave to amend on grounds of futility.  (See Defs.'

Opp. at 3).  Futility is established where the amendment "would fail to cure prior deficiencies or

to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." Thea v.

Kleinhandler, 807 F.3d 492, 496-97 (2d Cir. 2015) (internal citations and quotation marks

omitted); see also Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc., 889 F. Supp. 2d 453,

459 (S.D.N.Y. 2012) (stating that "[a] proposal to amend a complaint is futile if the proposed

amended complaint would fail to state a claim upon which relief could be granted").  "The

standard for denying leave to amend based on futility is the same as the standard for granting a

motion to dismiss."  IBEW Loc. Union No. 58 Pension Trust Fund & Annuity Fund v. Royal

Bank of Scotland Grp., PLC, 783 F.3d 383, 389 (2d Cir. 2015).  Accordingly, the Court must

"consider the proposed amendment[s] . . . along with the remainder of the complaint, accept as

true all non-conclusory factual allegations therein, and draw all reasonable inferences in

plaintiff's favor to determine whether the allegations plausibly give rise to an entitlement of

relief." Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 119 (2d Cir. 2012) (internal citations and quotation marks omitted).

When deciding a Rule 12(b)(6) motion to dismiss, courts consider whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is 'plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556); see also Hayden v. Paterson, 594 F.3d 150, 160-61 (2d Cir. 2010) (stating that the same standard guides the court's analysis of a Rule 12(c) motion).

Under this pleading standard, "labels," "conclusions," or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555) (internal quotation marks omitted). Instead, a plaintiff must provide enough factual support that, if true, would "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. However, the "plausibility standard" does not rise to the level of a "probability requirement[;]" instead, the standard requires "more than a sheer possibility that a defendant has acted unlawfully." Hayden v. Paterson, 594 F.3d at 161 (quoting Ashcroft v. Iqbal, 556 U.S. at 678) (internal quotation marks omitted).

Thus, in deciding a motion to amend that is challenged on grounds of futility, the Court considers whether the newly added claims contain sufficient factual allegations to state a plausible claim for relief. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated

on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982)).  Ultimately, when the well-pleaded facts do not permit a court to "infer more than the mere possibility of misconduct," a plaintiff has only alleged, rather than shown, an entitlement to relief, and the federal pleading standard has not been satisfied.  Ashcroft v. Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

### 2.  Additional Allegation of Harassment

As an initial matter, plaintiff seeks to update her First Amended Complaint to include allegations of an additional instance of harassment that took place in November of 2023.  (See Proposed SAC ¶¶ 188-190).  As described supra, plaintiff alleges that defendant Fraser-McCleary reprimanded her following an incident involving a patient's discharge arrangements.  (Id.)  Defendants do not oppose the motion to amend based on the facts of this incident, merely asserting in a footnote that it "falls drastically short of the worse-case harassment standard required to show a hostile work environment intolerable enough to support a constructive discharge claim."  (Defs.' Opp. at 5, n.2 (citing Kelly v. New York State Off. of Mental Health, 200 F. Supp. 3d 378, 402 (E.D.N.Y. 2016))).

Even if the Court assumes that this additional incident of harassment could not support a viable hostile work environment theory on its own, it still provides additional support for plaintiff's workplace discrimination claims.  Courts have recognized that the elusive nature of "direct, smoking gun, evidence of discrimination," Richards v. N.Y.C. Bd. of Educ., 668 F. Supp. 259, 265 (S.D.N.Y. 1987), means that plaintiffs "usually must rely on bits and pieces of information to support an inference of discrimination, i.e., a mosaic of intentional discrimination."  Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015) (internal citation and quotation marks omitted).  Accordingly, the Court grants plaintiff's motion to amend to add allegations relating to the November 2023 incident.

3. <u>Allegations of Constructive Discharge</u>

Plaintiff's Proposed Second Amended Complaint also seeks to add allegations that plaintiff was constructively discharged.  The newly added allegations begin by reiterating and summarizing facts and claims already raised in plaintiff's First Amended Complaint.  (<u>See</u> Proposed SAC ¶¶ 191-197; <u>see also</u> <u>supra</u> at 2-5).

Plaintiff newly alleges that "despite [her] best efforts to improve her working conditions by seeking accommodations, raising concerns about unlawful treatment, and requesting help at every turn . . . Downstate and Fraser-McCleary have forced Sanders to leave her job." (<u>Id.</u> ¶ 197).  Plaintiff also explains that she would have left earlier but she stayed until her son turned 26 and was no longer eligible for insurance coverage under her health plan.  (<u>Id.</u> ¶ 198).  Once her son turned 26, plaintiff informed her immediate supervisor on December 11, 2023 that she would be resigning from her position, and she later resigned, effective February 29, 2024.  (<u>Id.</u> ¶ 199).

Although the parties characterize these allegations as a "constructive discharge claim" (<u>see, e.g.</u>, Pl.'s Mot. at 8; Defs.' Opp. at 1), the Court notes that plaintiff does not seek to add a new and separate cause of action alleging constructive discharge.  In fact, her Proposed Second Amended Complaint maintains the same thirteen causes of action alleged in the First Amended Complaint.  (<u>See</u> Proposed SAC ¶¶ 200-276).  The allegation that she was forced to leave her job appears to be subsumed into the existing causes of action for workplace discrimination, failure to accommodate, and retaliation.  Even if plaintiff were seeking to add a separate cause of action for constructive discharge, the allegations in the Proposed Second Amended Complaint satisfy the pleading requirements for such a claim and thus are not futile.

To establish constructive discharge, a plaintiff must show that "'rather than discharging [her] directly, [her employer] intentionally create[d] a work atmosphere so intolerable that [she was] forced to quit involuntarily.'" Creacy v. BCBG Max Azria Group, LLC, 14 CV 10008, 2017 WL 1216580, at *11 (S.D.N.Y.  Mar. 31, 2017) (quoting Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d 252, 261 (S.D.N.Y. 2014); see also Pennsylvania State Police v. Suders, 542 U.S. 129, 134 (2004) (holding that plaintiff must demonstrate that "the abusive working environment became so intolerable that her resignation qualified as a fitting response").  Case law generally breaks this standard into two elements:  "the employer's intentional conduct and the intolerable level of the work conditions." Petrosino v. Bell Atl., 385 F.3d 210, 229 (2d Cir. 2004).  The Second Circuit has not "expressly insisted on proof of [an employer's] specific intent" to force an employee to quit to demonstrate constructive discharge; rather, a plaintiff needs to "at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligent or ineffective.'" Id. at 229-230 (internal citation omitted).  Plaintiff must also demonstrate that "the employer's deliberate actions rendered the employee's work conditions so intolerable as to compel resignation." Id. at 230 (internal quotation marks omitted).  The standard for asserting a constructive discharge claim is a "demanding one," requiring more than that an employee merely "preferred not to continue working for that employer or that the employee's working conditions were difficult or unpleasant." Miller v. Praxair, Inc., 408 Fed. App'x. 408, 410 (2d Cir. Nov. 24, 2010) (internal citation and quotation marks omitted).  Rather, "'[w]orking conditions are intolerable when, viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" Murdaugh v. City of New York, 2011 WL 798844, at *5 (quoting Terry v. Ashcroft, 336 F.3d 128, 152 (2d Cir. 2003)).

At this stage, plaintiff has sufficiently alleged that she was constructively discharged. Pursuant to various civil rights law, plaintiff's First Amended Complaint brought claims of workplace discrimination, failure to accommodate, and retaliation based on her allegations that defendants:  (1) refused her requests for reasonable accommodations to care for her son, including a request to work from home; (2) deliberately transferred her to an inpatient assignment, knowing of her son's disability and despite the risks of exposing plaintiff and her son to COVID-19; and (3) denied plaintiff further accommodations based on plaintiff's own disabilities.  (See FAC ¶¶ 61-78, 79-102, 115-143, 144-158).  She further alleged that defendants retaliated against her for making complaints about the treatment she had been receiving, and that this mistreatment was all because of plaintiff's own disability and her association with a person with a disability.  (See id. ¶¶ 2, 3, 101, 102, 114, 133-135, 159-169).

In seeking to add the new allegations regarding her constructive discharge, plaintiff alleges that these deliberate actions of her employer were so intolerable as to compel a reasonable person to resign.  In Berger v. New York State Office for People with Developmental Disabilities, the court granted a motion to amend where the plaintiff added a constructive discharge claim based on her allegation that she was "forced to work in a medical setting outside the scope of her training" based on gender.  No. 16 CV 1277, 2019 WL 4805389, at *6 (N.D.N.Y. Sept. 30, 2019).  Plaintiff brings analogous claims here.  After she took protected FMLA leave to care for her son, plaintiff alleges that defendants retaliated against her by transferring her to an inpatient unit which was not only outside the scope of her training but also exposed her to greater risks of infection.  (FAC ¶¶ 88-94, 95-100).  She contends that defendants acted specifically with the intent to punish her on account of her status as a caregiver to a disabled child.  (FAC ¶¶ 83-88, 102; Proposed SAC ¶¶ 193, 194).

15

In addition, plaintiff alleges that defendants denied her requests for reasonable accommodations to work from home or be transferred to outpatient services, which increased her disabled son's risk of being exposure to COVID-19.  (Proposed SAC ¶ 192).  Although the body of case law specifically relating to COVID-19 is still developing, other courts have denied motions to dismiss constructive discharge claims brought under similar circumstances.  See, e.g., Gayles v. Roswell Park Cancer Inst. Corp., No. 22 CV 750, 2023 WL 6304020, at *7 (W.D.N.Y. Sept. 28, 2023) (holding that, "although a close question, Plaintiff has plausibly alleged that Defendant disregarded her and her son's health and safety by denying her requests to work remotely," where plaintiff was required to work in person despite her fear of exposing her disabled child to COVID-19); Knight v. MTA New York City Transit Auth., No. 19 CV 1428, 2021 WL 10424509, at *11 (E.D.N.Y. Sept. 28, 2021) (granting plaintiff employee leave to add a constructive discharge claim based, in part, on alleged retaliation by defendant employer that included denying plaintiff's "request to telecommute during the COVID-19 pandemic"); see also Madray v. Long Island Univ., 789 F. Supp. 2d 403, 403 (E.D.N.Y. 2011) (holding that if viewed in a light most favorable to plaintiff, it is plausible that "a reasonable person in her position would have felt that they had no other alternative than to resign. . ." where plaintiff was previously denied tenure twice then offered discretionary employment that would result in her termination if she unsuccessfully applied for tenure a third time).

Here, defendants do not oppose plaintiff's motion to amend on the grounds that plaintiff has not adequately pled the elements of her workplace discrimination, failure to accommodate, and retaliation claims.  Instead, they contend that plaintiff's allegations of constructive discharge fail as a matter of law because she "freely admits that she voluntarily remained in her position for three and a half years after the challenged conduct occurred."  (Defs.' Opp. at 1).  While it is

16

not disputed that three and a half years elapsed between plaintiff's transfer from outpatient to inpatient services and her alleged constructive discharge, she asserts that the discrimination and harassment were ongoing until her resignation.  (Pl.'s Reply at 4).  The question before the Court is whether, as defendants assert, plaintiff's continued employment for three and a half years following the transfer is dispositive evidence that the position was not intolerable.

While enduring consistent intolerable working conditions for an extended period may be strongly indicative that a constructive discharge claim is futile, "[t]he passage of time by itself is not dispositive in a constructive discharge claim."  Gonzalez v. Bratton, 147 F. Supp. 2d 180, 198 (S.D.N.Y. 2001), aff'd, 48 F. App'x 363 (2d Cir. 2002); see also Barbetta v. Chemlawn Servs. Corp., 669 F. Supp. 569, 572 (W.D.N.Y. 1987) (holding that "constructive discharge need not follow immediately upon the heels of an offensive incident"); Dortz v. City of New York, 904 F. Supp. 127, 160 (S.D.N.Y. 1995) (finding that "[d]efendants' argument that [p]laintiff's resignation was too distant in time from the harassment [was] open to challenge").  Courts have considered a variety of reasons that employees might, for a time, tolerate working conditions that a reasonable person might find intolerable:

> Financial constraints, protection of professional standing, the time it may require to line up other employment, institutional loyalties, and even deeply personal, emotional reasons may operate to render an immediate departure inopportune, even against the pressure of unpleasant working conditions.

Stokes v. City of Mount Vernon, N.Y., No. 11 CV 7675, 2015 WL 4710259, at *6 (S.D.N.Y. Aug. 4, 2015) (quoting Gonzalez v. Bratton, 147 F. Supp. 2d at 198-99).  In short, "an employee being shown the door by backhanded means should not be required to exhibit fresh boot marks on her back on the date of departure as the only way to prove that the employer made her feel unwanted and unwelcome."  Gonzalez v. Bratton, 147 F. Supp. 2d at 199.

Drawing all reasonable inferences in plaintiff's favor, it is plausible that she had good

reason to delay her departure.  First, plaintiff spent the initial months following her transfer attempting to render her employment tolerable.  See Petrosino v. Bell Atl., 385 F.3d at 231-32 (holding that "where an employee has within her power the means to eliminate the added condition that purportedly renders her employment intolerable and fails to pursue that option, she cannot demonstrate that she was compelled to resign").  Plaintiff submitted a request for accommodation to Downstate's ADA office in October 2020, then appealed the decision in December 2020, and never received a second response.  (FAC ¶¶ 122, 132, 133, 142).  She filed a complaint with Downstate's Office of Diversity and Inclusion ("ODI") in November 2020, which was rejected in December 2020, and upheld on appeal in February 2021.  (Id. ¶¶ 145, 148, 149, 151).  Accordingly, the appropriate time window to consider is not the three and a half years between plaintiff's transfer and resignation that defendants suggest (Defs.' Opp. at 5), but the 2 years and 10 months between when plaintiff exhausted her administrative remedies and when plaintiff first informed her supervisor of her resignation.  (Proposed SAC ¶¶ 151, 199).  See, e.g., Albunio v. City of New York, 16 N.Y.3d 472, 475, 947 N.E.2d 135 (2011) (upholding a constructive discharge verdict where the plaintiffs delayed their resignation in order to achieve a pension milestone).

Second, plaintiff alleges that she would have left once it became apparent that defendants had "no intention of improving the working conditions which caused her health to deteriorate, but she had to stay in order to maintain health insurance for her son."  (Proposed SAC ¶ 189).  As noted above, plaintiff is the primary caregiver to her son, who lives with Ulcerative Colitis and has undergone extensive treatment for his condition, including an array of planned surgeries and an emergency life-saving surgery.  (See FAC ¶¶ 43, 47, 49, 51, 52, 53, 60).  Given her son's medical issues and the corresponding expenses related thereto, plaintiff's explanation that she

could not leave her employment in the summer of 2020, particularly in light of the impact of the

COVID-19 pandemic on jobs and the economy in general, is not only credible, but rational.

Therefore, the Court finds that plaintiff has provided a plausible reason for why she did not

immediately depart in the face of allegedly intolerable working conditions.

The issue, if any, of the timing of plaintiff's departure is a fact-intensive inquiry more

appropriate for consideration at the summary judgment stage.  See Manners v. New York State

Dep't of Env't Conservation, No. 14 CV 810, 2015 WL 4276465, at *9 (N.D.N.Y. July 14, 2015)

(holding that "constructive discharge analysis is a fact intensive inquiry more appropriately

addressed at the summary judgment stage"); Gonzalez v. Bratton, 147 F. Supp. 2d at 198 (stating

that the trier of fact must determine "whether the temporal relationship between the forced

resignation and the harassment is too distant"); Dortz v. City of New York, 904 F. Supp. at 160

(S.D.N.Y. 1995) (finding that the finder of fact is responsible for drawing any inferences "from

the fact that Plaintiff took her medical leave in May – on the heels of the retaliatory conduct, but

months after the last harassing comment . . .").  In fact, the majority of the cases defendants cite

in support of their argument that plaintiff's continued employment undermines her constructive

discharge claim as a matter of law were decided at the summary judgment stage, after the parties

had an opportunity to conduct discovery.  (Defs.' Opp. at 5-6 (citing Byer v. Periodontal Health

Specialists of Rochester, PLLC, No. 20 CV 1751, 2021 WL 3276725, at *3 (2d Cir. Aug. 2,

2021) (affirming trial court's grant of summary judgment motion on constructive discharge

claim); Pressley v. City of New York, No. 11 CV 3234, 2015 WL 13730699, at *10 (E.D.N.Y.

Aug. 27, 2015) (summary judgment); Aspilaire v. Wyeth Pharms., 612 F. Supp. 2d 289, 312

(S.D.N.Y. 2009) (summary judgment); Garrett v. Mazza, 2005 WL 2094955, at *5 (summary

judgment); Rodriguez v. Graham-Windham Servcs. to Families & Children, No. 99 CV 10447,

2001 WL 46985, at *6 (S.D.N.Y. Jan. 18, 2001) (summary judgment).  As such, the holdings of these cases do not necessarily control the more "liberal standard" for motions to amend. Agerbrink v. Model Serv. LLC, 155 F. Supp. 3d at 452.

Defendants do cite Murdaugh v. City of New York, wherein the court granted a motion to dismiss a constructive discharge claim, and they directly quote part of the court's holding in an explanatory parenthetical:  "a significant passage of time where the employee endured the conditions complained of is sufficient to undermine a claim that working conditions were intolerable."  (Defs.' Opp. at 5 (citing 2011 WL 798844 at *6)).  Defendants, however, omit the beginning of that sentence, where the court refers to the "[a]bsen[ce of] deliberate employer action," Murdaugh v. City of New York, 2011 WL 798844 at *6, which is a signal indicating that the court's decision was not premised on the passage of time alone.  The court found that, although the plaintiff in Murdaugh sufficiently pled a hostile work environment to support her discrimination claim, she failed to allege that the defendant "intentionally or deliberately caused Murdaugh's work atmosphere to be so intolerable as to force her to resign."  Id.  The absence of allegations of deliberate conduct, in combination with the lengthy passage of time, led the court to dismiss her constructive discharge claim.

In this case, however, plaintiff alleges that defendants took deliberate action, including denying her an accommodation to work from home despite the risks of COVID-19 exposure to her disabled son, transferring her to an inpatient position in retaliation for her taking protected FMLA leave, and further denying her requests for accommodation when she developed her own disability.  (FAC ¶¶ 61-69, 84, 122-133).  Accordingly, unlike in Murdaugh, the passage of time between plaintiff's transfer and resignation does not, by itself, render her allegations of

constructive discharge futile as a matter of law, nor does it warrant the denial of her motion for leave to amend.

"While there is a high threshold for establishing a constructive discharge claim, proposed amendments are construed liberally." Madray v. Long Island Univ., 789 F. Supp. 2d at 411. Viewing the facts in a light most favorable to the plaintiff, the Court finds that plaintiff has plausibly alleged that a reasonable person in her position would have felt that they had no other alternative than to continue in their employment despite the intolerable conditions. At the motion to dismiss stage, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Walker v. Schult, 717 F.3d at 124. The Court finds that plaintiff's continued employment does not make her allegations of constructive discharge implausible, and that she is therefore entitled to offer evidence in support of her allegations.

CONCLUSION

Accordingly, for the reasons set forth above, plaintiff's motion to amend is granted.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
        November 5, 2024

*Cheryl L. Pollak*
_____
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York